**14 So.2d 19**

**WALL v. CLOSE, Director of Finance, et al.**

**No. 36838.**

April 12, 1943.

Rehearing Denied May 17, 1943.

See, also, 201 La. 986, 10 So.2d 779.

Eugene Stanley, Atty. Gen., W. D. Goff, 1st Asst. Atty. Gen., W. C. Perrault, 2nd Asst. Atty. Gen., and James I. Smith, Joseph A. Loret, and Arthur B. Hammond, all of Baton Rouge, for defendants and appellants.

Kemble K. Kennedy, of Baton Rouge, and James H. Morrison, of Hammond, for plaintiff and appellee.

ODOM, Justice.

Act 111 of 1942 created a Department of Finance for the State of Louisiana and authorized the Department to exercise certain designated administrative functions. Under the act, the Governor is authorized to appoint a Director of Finance, who is the head of the Department. The Governor appointed Martin L. Close to this position.

Act 266 of 1942, the general appropriation act, appropriated for the use of, and set aside to, the Department of Finance certain sums for the fiscal year 1942–1943 and for the fiscal year 1943–1944.

The plaintiff, alleging that he was a resident of the State and a taxpayer, ruled Martin L. Close, Director of Finance; Andrew P. Tugwell, State Treasurer, and Ludlow B. Baynard, State Auditor, to show cause, on a day to be fixed, why a preliminary injunction should not issue according to law, (1) enjoining, prohibiting, and restraining Martin L. Close, Director of Finance, from issuing any warrants or other orders for the withdrawal from the State Treasury of any part of the amounts appropriated for the Department of Finance; (2) enjoining, prohibiting, and restraining Ludlow B. Baynard, State Auditor, from issuing his warrants or other orders to the State Treasurer for the signing of any check for the payment of any funds out of the State Treasury made available to the Director of Finance, and (3) enjoining, prohibiting, and restraining Andrew P. Tugwell, State Treasurer, from honoring or paying any such warrants.

Plaintiff's application and prayer for a rule to show cause was grounded upon his allegation that the Department of Finance had no legal existence, because Act 111 of 1942, which created it, was invalid in its entirety for the reason that the statute, as House Bill No. 40, did not pass the two houses of the Legislature in accordance with constitutional requirements, and therefore the act is not a valid act and has not the force and effect of law; and upon the allegation that, even if the act was adopted in accordance with constitutional requirements, the act itself is unconstitutional.

The defendants were ordered to show cause why a preliminary injunction should not issue as prayed for by plaintiff.

Defendants excepted to the rule on the ground that it set out no cause or right of action. Without waiving their rights under the exceptions and with full reservation, the respondents answered, specifically denying plaintiff's allegation that Act 111 of 1942 has no legal existence, and his allegation that the act is unconstitutional.

The trial judge overruled the exceptions of no cause or right of action. There

was judgment in favor of plaintiff and against the defendants as prayed for. The case is now before this court on appeal prosecuted by the defendants.

1. Counsel for plaintiff argue, and the trial judge held, that Act 111 of 1942 is invalid in its entirety because, as stated by counsel in his brief, the "statute as House Bill No. 40 did not pass the two Houses of the Legislature in accordance with the constitutional requirements, and therefore, same is not a valid Act and has not the force and effect of law; that, moreover, the two Houses of the Legislature did not pass the same Act under the guise and pretense of passing House Bill No. 40 or Act 111 of 1942".

Counsel's main argument in support of this point is that on June 22, 1942, the House of Representatives, while considering House Bill No. 40 on final passage, resolved itself into a Committee of the Whole, "at which time a total of 36 amendments of substance were sent up by various members of the House. The Journal of the House of Representatives of that date, pages 1051 and 1056, fails to show that the various amendments were ever acted upon. In short, the Journal of the House fails to reflect any action having been taken on the various amendments by way of rejection or adoption, the journal merely showing 'and the bill as amended was finally passed'."

It is argued that this language, "and the bill as amended was finally passed", does not necessarily indicate that any action was taken on the House floor amendments, because prior thereto, on June 5, 1942, the House Journal shows that certain House committee amendments were adopted. It is said that the statement in the House Journal "and the bill as amended was finally passed" may mean that the bill was passed as amended prior to June 22, 1942, and does not necessarily mean that the bill was adopted as amended while the House was in session as "a Committee of the Whole".

When the bill reached the Senate, it had incorporated into it the 36 amendments which were offered by various House members while the House was acting as a Committee of the Whole. The Senate adopted the House bill as amended, after certain amendments thereto made in the Senate were approved. It is clear, therefore, that the Senate approved the 36 floor amendments offered in the House. Hence the argument that, since the House did not adopt the 36 floor amendments, the Senate and the House did not adopt the same bill.

In commenting on this point, the trial judge said in his written opinion:

"When the bill reached the Senate in an engrossed form the House Floor Amendments mentioned above were incorporated therein, notwithstanding the fact that the official record fails to show the adoption of said amendments."

The "official record" mentioned by the trial judge is the House Journal. Counsel's argument therefore is, and the trial judge held, that, since the House Journal does not show affirmatively that each of the 36 floor amendments offered while the House was acting as a Committee of the Whole was

acted upon and approved, it follows that Act 111 of 1942 was not adopted in accordance with constitutional requirements.

Counsel for plaintiff do not argue, and the trial judge did not say, that, as a matter of fact, the amendments referred to were not formally acted upon by the House. The objection raised by counsel and approved by the judge is that the House Journal fails to show affirmatively that the amendments were in fact approved by the House.

Article III of the Constitution, which relates exclusively to the Legislative Department of the State, provides that the legislative power of the State shall be vested in a Legislature, which shall consist of a Senate and a House of Representatives. Section 15 of that article provides that each house "shall keep a journal of its proceedings, and cause the same to be published immediately after the close of the session."

Section 21 of that article provides that:

"The yeas and nays on any question in either house shall, at the desire of one-fifth of the members elected, be entered in the journal."

Section 24 of that article provides that every bill shall be read on three different days in each house, and that no bill shall be considered for final passage unless it has been read once in full and the same has been reported on by a committee; "nor shall any bill become a law unless, on its final passage, the vote be taken by yeas and nays, the names of the members voting for or against the same to be entered in the journal, and a majority of the members elected to each house be recorded thereon as voting in its favor."

Section 25 of the article provides that no amendments to a bill by one house shall be concurred in by the other, nor shall reports of committees of conference be adopted in either house, "except by a majority of the members elected thereto, the vote to be taken by yeas and nays, the names of those voting for or against to be recorded in the journal."

Section 26 of the article provides that, whenever a bill has been passed by both houses and has been enrolled and placed in possession of the house in which it originated, the title shall be read, "and at the request of any five members, the bill shall be read in full, when the Speaker of the House of Representatives or the President of the Senate, as the case may be, shall at once sign it in open house, and the fact of signing shall be noted in the journal."

As relates to the adoption and final passage of acts and as to what the journals of the houses must affirmatively show, the above are the only constitutional requirements. Nowhere in the Constitution is there found a requirement that the Journal of the Senate or of the House shall affirmatively show the adoption of floor amendments offered while the Senate or the House is acting as a Committee of the Whole.

As to the adoption of Act 111 of 1942, both the Senate and the House journals affirmatively show that all the constitutional

requirements relating to what must be recorded in the journals were complied with.

The House Journal shows that on May 12 the bill was introduced and read the first time by title; that on May 13 it was read the second time by title and referred to the Committee on Judiciary, Section C; that on June 4 the bill was reported with amendments; that on June 5 the bill was read by title, amended, ordered engrossed, and passed to third reading; that on June 8 the bill was read by title, and returned to the calendar subject to call; that on June 18 it was read by title, ordered engrossed, and passed to third reading; that on June 22 it was read by title, and the "House resolved itself into a Committee of the Whole to take into consideration the bill, at which time" certain named members of the House sent up, altogether, 36 "House Floor Amendments"; and that "The bill as amended was read in full"; that "Mr. Heintz moved the final passage of the bill", and that, after roll call showing the vote, "the bill as amended was finally passed".

The House Journal shows that on June 30 the bill was "received from Senate with amendments", and that on the same day the "Senate amendments were concurred in by House". The Journal shows that on July 1 the bill was enrolled, and that on the same day it was "read by title, signed by Speaker of House, taken to Senate, signed by Lieutenant Governor and President of the Senate, and then taken to Governor for executive approval".

Thus the House Journal affirmatively shows that the bill was finally passed by the House "as amended" and sent to the Senate; that it was received from the Senate, then enrolled by the House, and finally, on July 1, was "read by title, signed by Speaker of House", and taken to the Senate.

It is not reasonable to assume that the House would have finally passed the bill, and that the Speaker of the House would have signed it with these 36 House floor amendments incorporated into it, if the House had not previously approved these amendments.

It is true, of course, that, if the 36 House floor amendments were never approved by the House, the bill is invalid, because it is conceded that those amendments were incorporated into, and therefore became a part of, the bill as finally adopted by both houses. Since it was necessary that those floor amendments which were incorporated into the bill be approved by the House in order to make the bill as thus amended valid, and since the bill as amended was finally passed by the House and signed by the Speaker, the presumption is that the House did approve the amendments; and the fact that the House Journal fails to show what action, if any, was taken on the amendments affords no ground for holding that the amendments were not in fact approved. We must necessarily presume that they were approved.

The ruling announced by the Supreme Court of Illinois in the case of Board of Sup'rs of Schuyler County v. People, 25 Ill. 181, as shown by the following extract which we quote from the opinion in that

·case, is pertinent to this particular issue and is in accord with the jurisprudence which prevails here and elsewhere, and in line with the rules laid down by the text writers:

"Some acts performed in the passage of laws are required by the constitution to be entered on the journals, in order to make them valid, and among these are the entries of the ayes and nays on the final passage of every bill, and we held in the ·case of Spangler v. Jacoby, 14 Ill. 297 [58 Am.Dec. 571], that where the journal ·did not show this, the act never became a law. But where the constitution is silent .as to whether a particular act which is required to be performed shall be entered ·on the journals, it is then left to the discretion of either house to enter it or not, .and the silence of the journal on the subject ought not to be held to afford evidence that the act was not done. In such a case we must presume it was done, unless the journal affirmatively shows that it was not ·done." Cooley's Constitutional Limitations, 8th Ed., Vol. I, p. 277; West v. State, 50 Fla. 154, 39 So. 412; Whited v. Lewis, 25 La.Ann. 568; State v. Mason, 43 La. Ann. 590, 9 So. 776; Hollingsworth v. ·Tax. Collector, 45 La.Ann. 222, 12 So. 1; State v. Laiche, 105 La. 84, 29 So. 700; Town of Ruston v. Lewis, 140 La. 777, 73 So. 862, citing State v. Joseph, 139 La. 734, 72 So. 188.

Counsel for plaintiff in support of their ·contention cite the case of State ex rel. Porterie v. Smith, 184 La. 263, 166 So. 72, 77, but the ruling in that case has no application here. In that case, the complaint was that the bill was never in fact read in full in either the House or the Senate, whereas the journals of the House and the Senate showed that the bill was read in full in both houses. At the trial of the case, testimony was offered to vary the recitals of the journals, and the trial judge sustained the objection offered by counsel that parol testimony was not admissible for that purpose. What the court held in that case was that:

"The official Journals of the House and Senate, when published and preserved, constitute the ultimate proof of verity of the proceedings. No *extrinsic* proof is admissible for the purpose of contradicting the facts therein recited." (Italics ours.)

█ We find no merit in the argument that the bill was not adopted according to constitutional requirements.

2. Referring now to the question whether Act 111 of 1942 is unconstitutional, the first objection raised to the act is that it embraces more than one object, in violation of Section 16, Article III of the Constitution, which provides that:

"Every law enacted by the Legislature shall embrace but one object, and shall have a title indicative of such object."

The trial judge in his written reasons for judgment stated that "A plurality of objects appear in the Act under attack". But he did not say how many objects he thought the act embraced, nor did he comment on the nature of any of them. But counsel for plaintiff say in their brief that the act embraces 11 objects, which we shall discuss below in this opinion.

■ It is conceded by counsel for plaintiff that the title of the act is indicative of the multiple objects which they say it embraces. Their allegation of unconstitutionality is directed at the fact, as they claim, that the act itself embraces more than one object. They say in their brief that the requirement of singularity of subject imposed by the Constitution is not intended to embarrass honest legislation, "but only to prevent the vicious practice of joining in one Act incongruous and unrelated matter", and they say further that:

"If all the parts of a Statute have a natural connection and reasonably relate, directly or indirectly, to one general and legitimate subject of legislation, the statute is not considered as being open to the objection of plurality, no matter how extensively it deals with the details looking to the accomplishment of the main legislative purpose."

The rule thus stated by counsel is supported by jurisprudence and by text writers.

■ The rule which has been stated by this court over and over again, in language almost if not quite identical in the various opinions, is this:

"The constitutional requirement that a statute shall embrace only one object does not mean that each and every means necessary to accomplish an object in the law must be provided for by a separate act relating to it alone. A statute that deals with several branches of one subject does not thereby violate the constitutional provision."

This language is quoted from the case of State ex rel. Supervisor of Public Accounts v. Terrell, 1935, 181 La. 974, 160 So. 781, 782 (Rogers, J.). To the same effect, see Lacoste v. Department of Conservation, 1922, 151 La. 909, 92 So. 381 (Land, J.); State v. Craig, 1925, 158 La. 866, 104 So. 744 (O'Niell, C. J.), and Pires v. Youree, 1930, 170 La. 986, 129 So. 552 (St. Paul, J.).

In State v. Craig, supra [158 La. 866, 104 So. 745], this court said:

"The requirement that a statute shall have only one object does not forbid the Legislature to deal with several branches of the subject stated in the title of the act, or to provide in one act all of the means necessary for carrying out its object." (Citing a long list of cases decided by this court.)

In Peck v. City of New Orleans, 1941, 199 La. 76, 5 So.2d 508, 515 (McCaleb, J.), one of the questions involved was whether Act 84 of 1940, which provides for the use of voting machines in elections, was constitutional. One of the objections to the act was that it embraced more than one object, and the court said:

"To determine judicially whether a law is violative of the foregoing constitutional provision [Section 16, Article III], it is necessary first to examine the body of the Act in order to ascertain the purpose or aim of the statute." Citing State v. Morton, 182 La. 887, 162 So. 718.

Let us then examine the title and the body of Act 111 of 1942 in order to ascertain the purpose or aim of the statute.

As stated above herein, it is conceded by counsel for plaintiff that the body of the act is no broader than its title, and that each of the objects which counsel say the act embraces is indicated in the title.

In Airey v. Tugwell, 197 La. 982, 3 So. 2d 99, 102, we said:

"The object of a law is the aim or purpose of the enactment. State v. Ferguson, 104 La. 249, 28 So. 917, 81 Am.St.Rep. 123. The object of a law, 'properly speaking, is its general purpose'. 59 C.J. p. 800. The object of a law is the matter or thing forming the groundwork of the act."

In deciding whether a statute of the Legislature violates a constitutional provision which prohibits an act from embracing more than one object, courts must keep in mind its main purpose as disclosed by its language. It matters not how comprehensive the act may be or how numerous its provisions; it does not violate such a constitutional prohibition if its language, reasonably construed, shows that it has but one main, general object or purpose, and if nothing is written into it except what is naturally connected with, and is incidental or germane to, the one purpose or object.

According to its title, Act 111 of 1942 is one providing for a Fiscal Code for the State of Louisiana, and providing for all procedures necessary to establish a unified, comprehensive code of procedures for the financial administration of the State and all State agencies.

A code, according to Webster's New International Dictionary, is "Any systematic body of law, esp. one given statutory force; a compilation of laws by public authority; a digest". The word "fiscal", according to the same authority, means "of or pertaining to the public treasury or revenue; of or pertaining to financial matters generally". So, a "fiscal code" is a systematic body or digest of laws, given statutory force, pertaining to financial matters generally.

The act contains ten divisions, or "titles". An analysis or break-down of the provisions of the act under these various titles shows that nothing is written into the act except what is naturally connected with, and is incidental or germane to, its main, general purpose or object as already stated. The provisions of the act relate solely and exclusively to the fisc, or to the financial affairs of the State and its agencies, including procedures for financial administration.

Referring now to the alleged plural objects of the act, counsel for plaintiff say that one of its objects, in addition to providing for a Fiscal Code for financial administration, is "payment of claims".

The payment of claims due by or to the State and its agencies is directly connected with, and inseparable from, the administration of the financial affairs of the government.

Title VII of the act, under the heading "Payments Of Claims", provides in Section 1 that no public money is to be withdrawn from the State Treasury or otherwise disbursed for any purpose except to pay obligations under expenditures authorized ei-

ther by appropriation or by dedication of revenues or by other lawful authority. Section 2 of that title relates to forms for statements of indebtedness. Section 4 provides that the Director of Finance shall prescribe the forms of warrants on the State Treasury for the payment of approved claims. Section 5 relates to warrants for the payments of claims for which statements of indebtedness have been audited. Section 6 relates to the registration of the warrants issued, and Section 7 has to do with the acceptance of warrants by the State Treasurer. Section 8 relates to the use of signature machines, Section 9 to the paying and charging of claims of a prior fiscal year, and Section 10 to the issuance of duplicate warrants.

These provisions are but a part of the general procedure relating to the administration of the financial affairs of the State.

Another object is said to be "the disposition of unused State property".

While counsel have not referred us to the particular provision in the act to which this objection relates, we assume that they have reference to Section 16, Title IX of the act, which contains the provision, among others, that the rules of the Department of Finance shall prescribe the procedure by which supplies, materials, and equipment belonging to the State or its agencies "may be condemned and disposed of, by sale or otherwise, when of no further use to the State". It further provides that "Such rules" shall provide that no such property shall be sold otherwise than to the highest bidder "after every effort has been made to secure at least three competitive bids", and that no property condemned shall be sold except through notice published in a newspaper if such condemned property has a value exceeding $500. This section relates to the procedure for disposing of materials and equipment belonging to the State when such materials and equipment are "of no further use to the State". Materials and equipment, though worn out, may have some salvage value even if they be mere junk, and the disposal of them to the best advantage is a part of the administration of the financial affairs of the State.

The third alleged object of the act is said to be "the creation of an investigating unit or Crime Commission under the Director of Finance".

Presumably counsel refer to Section 3, Title X of the act, which provides that the Director of Finance is empowered, and that it shall be his duty, to make an investigation of "any of the financial affairs of the State", where he has reason to believe that there has been any mismanagement of such affairs by any officer, employee, or governing body responsible for the management "of any State funds". It further provides that the Director of Finance may recommend to the Governor that he, the Governor, proceed as provided by law for the removal of any officer or employee who is found to have "grossly mismanaged State financial affairs entrusted to him".

This provision of the act does no more than confer upon the Director of Finance the power and right to investigate and check the accounts of any officer, em-

ployee, or governing body of the State responsible for the management of State funds, and report his findings to the Governor. This relates to the regulation of the fisc of the State and is therefore necessarily a part of the code or body of laws enacted for the administration of the financial affairs of the State. The investigation and checking of the accounts of State officers, employees, and governing bodies is incidental to the main object or purpose of the act.

Counsel argue that the fourth object of the act is the "creation and establishment of a Department of Finance".

The establishment of such a department is but a part of the general scheme or plan to put into effect the Fiscal Code which the act provides for. The creation of such a department is germane to the object of the act and is necessary to make the Fiscal Code effectual.

According to counsel, the fifth object of the act is to repeal Act 48 of 1940, which they say was invalidated by the Supreme Court on May 25, 1942, and the sixth object is to repeal Act 174 of 1928, which act, it is said, has no direct or indirect bearing on, or connection with, the financial administration of the State.

Act 111 of 1942 did specifically repeal Act 48 of 1940 and Act 174 of 1928.

Act 48 of 1940 was one providing, among other things, for a unified, comprehensive code of procedures for financial administration, including financial planning and budgeting, accounting, current auditing of receivables and receipts, and re-auditing of expenditures. Act 111 of 1942 is concerned with the same subject matter as the prior act.

But the act of 1940 went much further and was broader in its scope. In addition to the matters just mentioned, it contained some provisions which were inconsistent and in conflict with some of the provisions of the 1942 act. It was necessary, therefore, that Act 48 of 1940 be repealed.

■ But counsel for plaintiff say that a repeal of Act 48 of 1940 was impossible because that act was declared unconstitutional by this court. This suggestion overlooks the fact that Act 111 of 1942 went into effect on July 10, 1942, while Act 48 of 1940 was still in effect. The court's opinion invalidating the 1940 act (Ricks v. Close, 201 La. 242, 9 So.2d 534) did not become final until a rehearing was refused on July 20, 1942, 10 days after the present act went into effect.

Counsel say that Act 174 of 1928 has no direct or indirect bearing on, or connection with, the financial administration of the State. Counsel are mistaken. The object or purpose of that act, as expressed in its title, was to make it the duty of the members and heads of certain public bodies, commissions, State institutions, State departments, and officials "handling public funds" to file with the Secretary of State and the State Auditor certain statements and reports showing the receipts and expenditures of all public funds coming into their hands. The provisions of that act are inconsistent and in conflict with certain provisions of Act 111 of 1942.

In Louisiana Greyhound Club, Inc., v. Clancy, Sheriff, 167 La. 511, 119 So. 532, 534, the plaintiff sought to have Act 70 of 1928 declared unconstitutional on the ground that it had more than one object. The fifth object of the act listed by counsel for the plaintiff in that case was "To repeal Act 352 of 1926 and all conflicting laws". In commenting on that objection to the act, the court said:

"To say that a general or special repealing clause is a separate distinct and foreign object to a legislative act appears to the court quite novel, and if that view was adopted it would strike down every act of the Legislature which sought expressly to repeal laws inconsistent therewith."

The rule generally accepted is that a general or special repealing clause in a statute relating to a particular subject or object, for the repeal of inconsistent or conflicting legislation, is not a separate and distinct object of the act within the meaning of a constitutional provision prohibiting an act from embracing more than one subject or object. 59 C.J., Section 389, page 803.

Another object of the act listed by counsel relates to "the merger and consolidation of functions, property, rights, credits, records, appropriations, personnel, assets and liabilities of executive and administrative offices, boards, commissions and agencies now existing, whether created by the Constitution or statute or to be created, irrespective of whether said duties and functions are of a similar nature or character".

Section 2, Title II of the act, provides that "All such functions as are described in the next preceding section, heretofore vested in or exercised by any existing agency, are hereby transferred to, and vested in, the Department of Finance".

The act provides that its "provisions shall not apply to the judiciary of the State". Section 1 (j).

The existing agencies referred to in Section 2, Title II, are the State Printing Board, the Louisiana Tax Commission, the State Bond and Tax Board, and other State agencies "to the extent the functions are in the nature of those hereby transferred to or vested in the Department of Finance".

Act 111 of 1942 does not consolidate any pre-existing boards or agencies, or merge them into the Department of Finance, but it does transfer to the Department of Finance certain functions which had been previously performed by those boards and agencies. It does not transfer from any board or agency any function which does not relate directly to financial administration. It does not take away from any officer, board, or agency any function or duty conferred by the Constitution itself. No board or agency is stripped of all of its functions.

Counsel in their brief do not elaborate this particular point, and for that reason we are not sure that we understand just what they mean when they refer to the merger or consolidation of "property, rights, credits, records, appropriations,

personnel, assets", etc. We fail to find in the act any reference to such matters.

Counsel say in their brief that these functions are transferred "irrespective of whether said duties and functions are of a similar nature or character". The answer to this objection is that, if any of the boards or agencies listed have functions which are not of a similar nature or character, such functions are not transferred. Since the object or purpose of the act is to establish a unified, comprehensive code of procedures for the financial administration of the State, the transfer of such functions as accounting, auditing, maintaining records of all State property, etc., from other agencies to the Department of Finance was a necessary and incidental step in the accomplishment of the general purpose or object of the act.

The next object of the act listed in counsel's brief is "the control and supervision by the Director of Finance of all state printing and supplies, without repealing Act No. 141 of 1912, as amended, which created the State Printing Board, and without regard to the constitutional mandates in connection therewith".

The act does not provide for the merger of the State Printing Board into the Department of Finance. It merely transfers to the Department of Finance certain functions of that Board. The act does not take away from the Printing Board any function, privilege, or prerogative conferred upon it by the Constitution. The State Printing Board was not created by the Constitution, but by the Legislature. The only reference in the Constitution to the State Printing Board is found in those sections which provide that the Board shall furnish to certain officers and departments printing, stationery, and office supplies under the State printing contract.

Act 111 of 1942 did not repeal Act 141 of 1912, which created the State Printing Board, except such parts of that act as may be inconsistent with the 1942 act. The repealing clause in the 1942 act reads as follows: "All laws or parts of laws, general or special, contrary to, or in conflict with or inconsistent with this Act are hereby repealed; specifically Act 48 of 1940 and Act 174 of 1928 are hereby repealed".

In addition to creating the State Printing Board, Act 141 of 1912 contains numerous provisions not related to the powers, duties, and functions of that Board. Among other provisions, that act directed in Section 22 that the police juries and municipal corporations in the various parishes of the State (the Parish of Orleans excepted) should annually select a parish or municipal printer for their respective parishes and municipal corporations. This and other provisions of the act relate to matters with which the State Printing Board has no concern. If the Legislature had repealed that act as a whole, it would have been necessary to adopt new legislation to replace those provisions of the act in no wise connected with the duties and functions of the Printing Board. The Legislature evidently had this in mind, and for that reason inserted the provision in the repealing clause of the 1942 act that all laws "or parts of laws"

contrary to, "or in conflict with or in-consistent with this Act are hereby repealed".

The next object of the act listed by counsel for plaintiff is to provide "rules and regulations to be prescribed by the Director of Finance for the sale by the State Penitentiary and other State agencies producing farm products, animals, manufactured articles, or other commodities".

This refers to the last sentence of Section 16, Title IX of the act, which reads as follows:

"Provided further that the State Penitentiary and other State agencies producing farm products, animals, manufactured articles, or other commodities, shall sell such commodities and articles in accordance with rules and regulations prescribed by the Director of Finance."

It is not contended or suggested by counsel that the Legislature did not have power and authority to authorize the Department of Finance to prescribe rules for the sale of such products and commodities. The contention is that the authorization of the Department of Finance to make such rules is an additional object of the act. We find no merit in this contention, for the reason that the main purpose of the act was to establish a unified, comprehensive code of procedure for financial administration of the State and its agencies. The sale of property and commodities belonging to the State is a financial transaction incidental and germane to the administration of the financial affairs of the State.

The next object of the act listed by counsel relates to the making of rules "regarding the procedure for receiving, depositing, accounting for and disbursing all moneys and securities deposited with any State agency, as security for the payment of any costs or charges, and all moneys deposited as bail to secure the appearance of persons charged with public offenses".

This relates to money received by State agencies, which money never in fact belonged to the State, was not appropriated to such agencies by the Legislature, and is therefore not dedicated to any special use—money deposited with such agencies as guarantee or security for the payment of costs or charges or for the performance of any specific acts, including money deposited as bail to secure the appearance of persons charged with public offenses, money deposited by bidders on contracts to insure their entering into contracts awarded them, and money deposited to indemnify persons whose property may be damaged or destroyed by the operations of the depositor. If the depositor lives up to his obligation, the money deposited to guarantee the faithful performance of the obligation is returned to him. If he defaults, he forfeits the amount deposited. Section 11, Title X of the act, authorizes the Department of Finance to make rules for the receiving and handling of such amounts as may be forfeited and the transfer of such amounts to the general fund of the State, except in cases where it is provided by law that they be credited to·

some other fund. Since it is obvious that such rules relate to financial transactions with which the State and its agencies are concerned, it follows that they are a part of the code of procedure for the financial administration of the affairs of the State and its agencies.

Finally, counsel alleged in their petition and say in their brief that one of the objects of the act is for the the Department of Finance, as created by Act 111 of 1942, to "succeed the Department as created by Act 47 of 1940, now invalidated, which is legally impossible".

As we have already said, a general or special repealing clause in a statute relating to a particular subject or object, for the repeal of inconsistent or conflicting legislation, is not a separate and distinct object of the act. The same may be said of a clause in an act stating that it shall be a successor to, or take the place of, a prior act of the Legislature.

Counsel's argument seems to be that Act 111 of 1942 could not succeed Act 47 of 1940, because this act has been invalidated by this court. The answer is that Act 47 of 1940, like Act 48 of the same year, was not invalidated until after Act 111 of 1942 was adopted. See Ricks v. Close, supra.

We find no merit in the contention that Act 111 of 1942 embraces more than one object.

3. It is contended that Act 111 of 1942 violates Section 1, Article V of the State Constitution. That section reads as follows:

"The executive department shall consist of a Governor, Lieutenant Governor, Auditor, Treasurer, Secretary of State, Register of the Land Office, Commissioner of Agriculture and Immigration, and Commissioner of Conservation. The Legislature shall have the authority to consolidate any of the above offices, except that of Governor, Lieutenant Governor, Treasurer, and Secretary of State."

Counsel for plaintiff say in their brief that Act 111 of 1942 "strips the offices mentioned of all or much of all their duties and supervision without any pretense of consolidation, but with the manifest intent and purpose to centralize into the Department of Finance the rights of said offices. This is certainly true insofar as the expenditure of funds is concerned. There is no provision in the statute for an administration of the financial affairs of the State by any agency other than the Department of Finance. *In other words, the Department of Finance apparently assumes a standing equivalent to a constitutional agency of the State as an additional executive department without any pretense of amending Section 1 of Article V of the Constitution*". (Italics are the writer's.)

Counsel's main argument in support of their allegation that this act violates Section 1 of Article V of the Constitution seems to be that the act, in creating the Department of Finance and providing for the appointment of a Director of Finance, provided for an additional officer to the Executive Department of the State, which could not be done without amending the Constitution.

The district judge in his written opinion pointed out that under Section 1, Article V of the Constitution, the Legislature could not authorize the consolidation of the offices of Governor, Lieutenant Governor, Treasurer, and Secretary of State, but that it was authorized to consolidate the other offices composing the Executive Department of the State. He said that "All of these offices compose the Executive Department and no other office may be added thereto without amending the Constitution, which has not been done".

It clearly appears, therefore, that both counsel and the district judge were of the opinion that Act 111 of 1942 added an office to the Executive Department of the State.

If that were true, the act would be unconstitutional, because the Constitution specifically designates the officers who shall compose the Executive Department of the State.

A reading of the act discloses that it does not have the drastic and far-reaching effect attributed to it. It does not add an officer or office to the Executive Department of the State. It does not purport to strip, nor does it in fact strip, any officer of the Executive Department of the government of any of the duties and functions conferred upon such officers by the Constitution. The act does not centralize into the Department of Finance the rights, duties, and privileges of those officers.

The purpose of the act, as indicated by its title, is to provide for a financial code for the State—i.e., a digest of the laws pertaining to financial matters generally—and

to provide rules of procedure relating to the administration of the financial affairs of the State. The act 'creates the Department of Finance and confers upon it certain functions, but it does not purport to reorganize the Executive Department of the State Government. The functions, duties, powers, and prerogatives of the Department of Finance are all set forth at length and in detail in the body of the act. Its functions and duties are many, but its powers are limited.

The Governor is chief executive officer of the State. Section 13, Article V of the Constitution, provides that the Governor may "require information in writing from the officers in the executive departments upon any subject relating to the duties of their respective offices", and that he shall from time to time "give to the Legislature information respecting the affairs of the State, and recommend to its consideration such measures as he may deem expedient".

With respect to matters of this kind, Act 111 of 1942 requires the Department of Finance, through its Director, to assist the Governor in gathering such information and data respecting the affairs of the State as the Governor thinks should be transmitted to the Legislature.

Section 1, Title III of the act, provides that the Governor, "with the advice and assistance of the Director of Finance and the Budget Officer", shall prepare and submit to the Legislature an executive budget presenting a complete financial plan for each year of the ensuing biennium, and that the said budget shall, prior to submission by

the Governor to the Legislature, "be submitted to the Louisiana Tax Commission for its recommendations to the Legislature".

Section 2 of Title III provides, that the financial plan presented by the Governor shall be adopted with such amendments "as may be determined by the Legislature". The executive budget mentioned is not made by the Director of Finance, but is made by the Governor "with the advice and assistance" of the Director of Finance, and the budget is then submitted to the Louisiana Tax Commission for its recommendations.

Section 3, Title III, provides that the executive budget shall present a "complete financial plan for each fiscal year", which plan shall be set forth in a budget message signed by the Governor, giving a summary description of his proposed financial policies and plans, and shall set forth a summary of the financial conditions of the State; that it shall include a consolidated current account balance sheet showing all current assets and liabilities of the State, and the current account surplus or deficit, as the case may be, at the close of each of the two fiscal years last concluded; statements showing the condition of the State funds, current assets and liabilities, and the current account of surplus or deficit; statements of revenues and receipts for the fiscal year last concluded, and the estimated revenues and the receipts of the current year; statements showing excess of current accounts over all current liabilities as of the beginning of each of the two fiscal years, and a summary statement of the changes in each surplus account during each of the

said fiscal years; a statement showing by actual figures the total debt and the total funded debt of the State, and the par value and estimated actual value of sinking fund assets and any other assets held for redemption of the funded debt. Section 3 provides also that the Governor shall send to the Legislature such other information as he may deem desirable or as may be required by law.

The gathering of all such information is a task which could not possibly be accomplished by the Governor without assistance, and the function of the Director of Finance and his assistants is to assist the Governor in collecting the data. But the statement and the budget are not made by the Director of Finance, but by the Governor with the assistance and advice of the Director.

Section 4, Title III of the act, provides that the Budget Officer, which office is one of those provided for in the Department of Finance, shall prescribe the forms to be used by the budget units in submitting their budget estimates and requests for appropriations. A "budget unit", as defined in Section 3, Title I, means any spending agency of the State for which special appropriations are made or which operates upon dedicated revenues.

Section 6 of Title III provides that the Budget Officer, under the direction of the Director of Finance, shall have in continuous process of preparation and revision a tentative budget for the next biennium "in the light of direct studies of the operation, plans and needs of budget units

and of the yields of existing and prospective sources of revenue". The same section provides that the Budget Officer shall hold hearings on the tentative budgets, at which hearings "the head of each budget unit shall be entitled to be heard", and that such tentative budget, when approved by the Budget Officer, "shall be certified, with the legislative recommendations of the Louisiana Tax Commission, to the Governor".

Section 7, Title III, provides that the Governor, during the progress of the preparation of the executive budget, and prior to its submission to the Legislature, "may make or cause to be made such examinations of the statements and estimates thereof or such further investigations as he may deem advisable, and he may hold further hearings or cause further hearings to be held if he deem advisable". That section further provides that the Governor may "direct such changes or revisions in policy and program, and in specific details, as he may find warranted". It further provides that the Governor shall submit his budget to the Legislature "with the recommendations of the Louisiana Tax Commission", and the same section further provides:

"The Budget Officer and the Director of Finance shall render every practicable assistance to the Governor in his considerations and revision of the executive budget in process."

Section 9 of Title III further provides that:

"From the time of the transmission of the executive budget to the Legislature un-til the appropriation bills shall have been finally acted upon, the Director of Finance and the Budget Officer, in person or by assistants, shall stand ready to assist the Legislature and the appropriation committees thereof, and shall assign one or more employees familiar with the contents of the executive budget as may be required, to the work of the appropriation committees."

Section 10 of Title III provides that, after the passage of the appropriation and revenue acts, "the Budget Officer under the direction of the Director of Finance shall cause to be prepared a complete State budget for each year of the ensuing biennium." This does not mean that the Budget Officer, under the direction of the Director of Finance, is granted power and authority to make up a financial budget for the State. A reading of the entire section shows that, after the executive budget has been accepted and revised by the Legislature and appropriations made in accordance therewith, the Budget Officer compiles a statement setting forth in detail the financial plan presented in the executive budget as modified and adopted by the Legislature. That section provides that "The budget so prepared shall include all the details of the financial plan for each year, as to both expenditures and means of financing, as presented in the executive budget, with such revisions as may be necessary to bring them into conformity with the appropriation and revenue acts and other acts to provide means of financing". It further provides that the Budget Officer shall cause the budget to be printed or otherwise dupli-

cated, "and copies thereof to be distributed to the heads of the budget units, the Louisiana Tax Commission and a reasonable number of copies to be kept available for public distribution". This detailed, itemized plan is prepared for the information and convenience of the spending units and the Louisiana Tax Commission.

Clearly, therefore, the functions of the Director of Finance and the officers serving in or under that department are to assist the Governor and the Legislature in gathering the data which are to form the basis of the appropriations for the different departments and agencies of the State. In no way may these officers dictate or dominate the financial policies of either the Executive or the Legislative Department of the State. The Department of Finance is in no sense, therefore, a department of the Executive Branch of the government. It is no more so than would be an expert accountant or auditor employed by the Executive Department of the State to gather data necessary to guide that department in formulating its financial plans.

The other officers composing the Executive Department of the State government mentioned in Act 111 of 1942 are the Auditor, the Treasurer, the Secretary of State, and the Register of the State Land Office.

In so far as they relate to the maintaining of records of all property of State agencies and the enforcing of accountability for such property, the provisions of the act do not apply to the control of such property as is exercised by the Register of the State Land Office. Section 1, Title II, Paragraph (h).

Section 4, Title V of the act, relates to statements of receivables which are to be made to the Department of Finance by the heads of budget units responsible for collection of any money due to the State. It is required that these monthly statements show the name and address of each debtor, the nature of the claim, the amount thereof, etc., "except in the cases of the Department of Revenue, Secretary of State as to Corporation Franchise Tax and the various Tax Collectors".

The offices of Secretary of State and Register of the State Land Office are not mentioned in the act except as shown above.

The State Auditor is mentioned twice in the act. Section 3 of Title V provides that the State Auditor and all other officials and agencies of the State shall furnish to the Department of Finance "copies of all remittances, pay-in documents", etc. Section 4 of the same title provides that the State Auditor "shall be charged with rendering such statements in relation to receivables subject to collection by the State Tax Collectors in the several parishes".

These requirements do not in the slightest degree interfere or conflict with the duties and prerogatives of the State Auditor.

As to the State Treasurer, Section 4 of Title VII provides that the Director of Finance shall prescribe the form of warrants on the State Treasury for the payment of approved claims. Section 7 of the

same title provides that every warrant upon the State Treasury issued in accordance with the provisions of the act shall be signed by the Director of Finance and countersigned by the Controller, and shall "constitute full and sufficient authority to the Treasurer for the disbursement from the Treasury in the amount set forth", and that "the Treasurer shall countersign all such warrants and enter on each the bank at which it is payable".

Section 1 of Title VIII of the act provides that certain moneys shall be credited by the State Treasurer to the agencies to which the dedication is made. Section 2 provides that all State agencies shall draw from the State Treasury "lump sum allotments as prescribed by law against the appropriation or other funds to the credit of such agency in the State Treasury", and such withdrawals shall be by warrants drawn upon the State Treasury, and that the amount of such withdrawals "shall be deposited in an operating bank account with a bank to be designated by the State Treasurer". Section 4 provides that no disbursement shall be made from such operating bank accounts "except upon warrants duly signed by the State Treasurer, the Director of Finance, and the Controller". Section 6 of the same title provides that "The Treasurer shall designate as State depositories such National or State banks or trust companies, doing business in this State, *as he may deem advisable,* after *considering* the recommendations of the Director of Finance". (Italics are the writer's.)

Section 6, Title X, mentions the State Treasurer but has no relation to his duties. Section 7 of the same title prescribes the penalty which may be inflicted upon the State Treasurer in case of unlawful neglect of his duties or for corruption or extortion in office. Section 8 of the same title relates to certain warrants which may be drawn by the Treasurer, and Section 9 relates to the form and use of treasury pay-in vouchers. Section 10 of the same title provides that every agency having private funds or contributions made available for its support, or for the purpose of defraying expenses of any work done, "shall deposit such funds or contributions with the Treasurer" in the manner prescribed by the act. It further provides that the Treasurer shall keep each such fund "in a special deposit entirely separate and distinct from those of any other funds", and that the disbursement of such funds and contributions shall be made "by the [State] Treasurer only on warrants drawn in accordance with the provisions of this Act". Section 12 provides that the State Treasurer may disqualify any depository of State funds for failure to furnish monthly reports and statements as required by the act.

The offices of State Auditor and State Treasurer are created by the Constitution, and it is provided therein that these officers are among those composing the Executive Department of government. But the Constitution does not prescribe their duties, except that, as to the Auditor, it is provided in Section 16, Article VI, that the accounts of the Commissioners of the Port

of New Orleans "shall be subject to audit and investigation by the State Auditor or Supervisor of Public Accounts, and the Auditor shall countersign all bonds hereafter issued". The functions, duties, and powers of the Auditor and the Treasurer are prescribed by the Legislature. (As to the duties of the Auditor, see Revised Statutes, Sections 173–274, inclusive, and special acts printed in connection therewith. As to the duties of the Treasurer, see Revised Statutes, Sections 3765–3805, inclusive, and special acts printed in connection therewith.) Their duties relate exclusively to the fisc, or to the financial affairs of the State. A detailed analysis of Act 111 of 1942 shows that it does not take from, or interfere with, their duties, functions, and prerogatives already fixed by statute.

■■■■ In this connection, it is proper to state that the Legislature has absolute control over the finances of the State, except as limited by constitutional provisions. The general rule is concisely stated in 59 C.J., Section 341, page 197, as follows:

"Except as limited by constitutional provisions, the legislative body of the state has absolute control over its finances. Thus subject only to constitutional restrictions, the legislature's power over state funds is plenary * * *."

See also 11 Am. Jur., Section 191, page 891; Colbert v. State, 86 Miss. 769, 39 So. 65; State v. Board of Liquidation, 136 La. 571, 67 So. 370; Storen v. Sexton, 209 Ind. 589, 200 N.E. 251, 104 A.L.R. 1359; Cobb v. Parnell, 183 Ark. 429, 36 S.W.2d

388; Cooley's Constitutional Limitations, 8th Ed., pages 176–177.

Therefore, since the duties of the Auditor and the Treasurer are fixed by the Legislature, that branch of the State government was within its rights in changing or modifying the duties of those officers, if, in fact, it did so by Act 111 of 1942. But, as already stated, that act made no substantial changes in their duties.

It was held by the trial judge that Act 111 of 1942 violates Section 1 of Article V of the Constitution "for the identical reasons that the Supreme Court held that Act 48 [of 1940] violated it".

In Ricks v. Close, 201 La. 242, 9 So.2d 534, this court held that Acts 47 and 48 of 1940 were unconstitutional. Act 48 of 1940 was an act, according to its title, "Providing a unified, comprehensive code of procedures for financial administration, including financial planning and budgeting", etc. In many respects that act was similar to Act 111 of 1942. But its provisions were by no means identical with those of the later act.

Act 47 of 1940, as indicated by its title, was an act "to reorganize and simplify the organization and operations of the Executive Department of the State government for purposes of better service and economy, through the enactment of an Administrative Code providing for an administrative service composed of the Governor's office and an executive cabinet, twenty administrative departments, and two independent establishments and for an

office of auditor of state to provide for independent auditing of state agencies".

Act 384 of 1940 was a joint resolution proposing amendments to the Constitution of Louisiana "relative to the form of organization of the Executive Department of the State government".

This joint resolution was submitted to the people and adopted, but in the case of Graham v. Jones, 198 La. 507, 3 So.2d 761, this court held that act unconstitutional.

In so far as Act 47 of 1940 was concerned, its validity depended entirely upon the adoption of the constitutional amendment proposed by Act 384, and in Ricks v. Close, supra, it was held that, when Act 384 was held invalid by this court, Act 47 necessarily fell with it. In the case of Ricks v. Close [201 La. 242, 9 So.2d 538], this court said:

"As previously stated in this opinion, Acts Nos. 47, 48, and 384 of 1940 were all passed at the same session of the Legislature and were a part of the plan to reorganize the Executive Department and to establish a unified system of financial administration. The reorganization of the Executive Department and the establishment of a unified system of financial administration are dependent upon the changes sought to be made in the Constitution by Act No. 384 and are framed in compliance with the proposed changes in the Constitution. The acts as well as the proposed amendment are inextricably interwoven, interrelated and dependent upon each other."

The court held that both Act 47 and Act 48 were unconstitutional. Act 48 provided for financial administration. The court in Ricks v. Close did not hold that the Legislature was not vested with authority to adopt a financial code. Act 48 was held to be unconstitutional because by its very terms it was "interwoven, interrelated and dependent upon" the validity of Acts 47 and 384 of the same session. The court gave compelling reasons why it was necessary to hold that Act 48 was invalid. The court pointed out that Section 2 of Title IX of that act created the Department of Finance as outlined in Title VI of Act 47, and that the first section of Title IX provided that that title was made part of the act for the purpose of providing the necessary organization for giving effect "to the substantive and procedural provisions of the other titles of the Act". The court quoted the following provision of Section 1, Title IX of Act 48:

"If and when a department of finance, a treasury department, and an office of auditor of State are provided *by any other act relating to the general organization of the State government the provisions of this title shall cease to be of any force or effect.*" (Italics ours.)

A Department of Finance, a Treasury Department, and an office of Auditor of State were provided by another act, Act 47 of the same session of the Legislature. Therefore, Title IX of Act 48 fell in its entirety, and, since that title created the Department of Finance and since that title fell with the fall of Act 47, there was no department to administer the financial code

provided for by Act 48. In this connection we said:

"In fact, from a reading of Section 1(c) of Title II of Act No. 47 and Title IX of Act No. 48, the conclusion is inescapable that all other agencies are precluded from administering the financial affairs of the State. Without going into the various other provisions of the Act that might be violative of the Constitution, it is sufficient to say that the Department of Finance, as so created, cannot be upheld, and since all other agencies are prohibited from administering the financial affairs of the State, Act No. 48 is without effect."

For this, if for no other reason, Act 48 of 1940 was without effect, but the court said further:

"Throughout Act No. 48 of 1940, it will be seen that the unified financial system contemplates the constitutional changes sought to be made by Act No. 384. Illustrations of this fact are the provisions in Title IX under the following sections, viz., Section 4, 'Transfers of Functions'; Section 9, 'Department of the Treasury'; Section 12, 'Office of the Auditor of State Created as Agency of the Legislative Department'; Section 20, 'Transfer of Employees'; and Section 21, 'Transfer of Appropriations.'"

The author of the opinion in Ricks v. Close evidently gave careful consideration to the provisions of Title IX of Act 48. Section 9 of that title provided:

"There shall be, and is hereby created, a department of the treasury which shall consist of the treasurer, and such subordinate employees as may be provided in accordance with law and appropriations."

Under Section 12 of that title of the act, the office of Auditor of State was created as an agency of the Legislative Department.

Section 20 of the same title of the act provided for the transfer of employees from one department or agency to other departments and agencies, and Section 21 provided for the transfer of the appropriation of Funds from one State agency to another State agency.

These constituted highly objectionable features of the old act, but not one of these objectionable features of the old act is found in Act 111 of 1942. The ruling in the Ricks v. Close case affords no reason for holding that Act 111 of 1942 is unconstitutional.

We find that Act 111 of 1942 does not violate Section 1, Article V of the Constitution.

▮▮▮ 4. Counsel for plaintiff argue, and the trial court held, that Act 111 of 1942 violates Sections 1 and 2, Article II of the Constitution. Those sections read as follows:

"§ 1. The powers of the government of the State of Louisiana shall be divided into three distinct departments—legislative, executive, and judicial.

"§ 2. No one of these departments, nor any person or collection of persons holding office in one of them, shall exercise power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted."

The trial judge, after referring to Section 19, Title III of the act, said:

"It appears that the courts are estopped from hearing any protests or complaints of the heads of budget units involving the spending of public money appropriated specifically by the Legislature for the reason that the provision cited provides that any decision rendered by the Board of Finance in such matters is final and conclusive. Quite naturally, the Bill of Rights, with its guarantee of open courts and administration of justice, is likewise flaunted by the provisions."

Section 19, Title III of the act, to which the judge refers, provides that the head of any budget unit (a budget unit as defined by the act meaning any spending agency of the State, for which separate appropriations are made), aggrieved by any decision of the Budget Officer or Director of Finance, "may appeal therefrom to the Board of Finance, and its decision shall be final and conclusive".

Evidently the judge overlooked the provisions of Subsection (2), Section 5, Title II of the act, which provides:

"(2) A right of appeal to the Board of Finance with a full hearing is hereby granted to any State agency in any case in which the Director of Finance has attempted to withhold funds from any budget unit contrary to law. The decisions of the Board in any such matters of appeal and of reference by the head shall be binding, *subject to all rights of action and judicial review provided by law.*" (Italics ours.)

Section 19, Title III of the act, and Subsection (2), Section 5, Title II, must be read and construed together, and, when so construed, it clearly appears that any State agency, aggrieved by a ruling of the Board, may appeal to the courts for redress.

It was further held that Section 11, Title X of the act, violates Article II of the Constitution, because the act authorizes the Department of Finance to disburse certain moneys, "a legislative function, and not a function of an administrative agency".

Section 11, Title X of the act, does not authorize the Department of Finance to "disburse" any moneys belonging to the State or to any of its agencies. The word "disburse", according to Webster, means "To pay out; expend". The funds referred to in Section 11, Title X of the act, are such funds as go into the hands of certain State agencies but are not intended to become the property of such agencies unless finally forfeited as provided by law. The act provides that the rules of the Department of Finance shall prescribe the procedures for "receiving, depositing, accounting for, and disbursing of moneys and securities deposited with any State agency or officer, as guarantee or security for the payment of any costs or charges, or for the performance of any specific act including, by way of extension and not of limitation, all moneys deposited as bail to secure the appearance of persons charged with public offenses, all moneys deposited by bidders on contracts to insure their entering into contracts awarded them, and all moneys deposited to indemnify persons whose prop-

erty may be damaged or destroyed by the operations of depositor". It further provides that such rules shall provide for the manner of "making refunds of amounts paid to the State in error, and in other cases in which refunds of amounts paid to the State may be made". It further provides that the moneys or securities so deposited or paid may be returned to the depositors by the officers having administrative charge thereof without specific appropriation, allotment or commitment voucher therefor, "should the depositors become entitled to the return" thereof, and further provides that, upon the default of the depositors, the amounts forfeited shall be credited to the "general fund, except as provided by law that they be credited to some other fund".

When moneys thus deposited are finally forfeited and no longer belong to the depositors, they are to be credited to the "general fund", and they then belong to the State or its agencies and are to be disbursed in the manner provided for the disbursement of other funds. Act 111 of 1942 does not provide for the disbursement of moneys forfeited to the State or its agencies. There is no reason why the Legislature should not provide for the handling and disposition of moneys deposited with the State agencies before they are finally forfeited.

It was held that Sections 16 and 17, Title III, and Section 19, Title IX of the act, authorize the transfer of working capital and appropriations from one State agency to another, in violation of Article II of the Constitution, and in violation also of Article IV. It is pointed out that this court in Graham v. Jones, supra, 198 La. 507, 3 So.2d 761, held that the Budget Officer could not transfer funds appropriated to the Charity Hospital of New Orleans to any other department or agency of the State.

As a matter of fact, there is no provision in Act 111 of 1942 which authorizes the transfer of any funds of working capital from one State agency to another State agency. Section 16, Title III, provides that no work shall be commenced and no contract shall be entered into for the improvement of lands and the construction or alteration of any buildings or other structures involving an expenditure from the State Treasury under any appropriations (except for the expenditure of funds dedicated in the Constitution to the construction and maintenance of the highway system of the State) until plans and specifications, estimates of costs, and bids received covering the entire work contemplated shall have been submitted to the Budget Officer and approved by him, and further, that the Budget Officer shall not approve the contract and the expenditure of such funds if he finds that the cost of the work will exceed the amount of the appropriation therefor, or if he finds that the work contemplated will be insufficient for the purposes for which such appropriation was made. That section has nothing whatever to do with the transfer of funds.

Section 17, Title III of the act, provides that:

"Transfers from an allowance for one budget class to an allowance for another

such budget class within the same allotment may be authorized by the head of the budget unit to which the allotment was made."

A reading of this section shows clearly that the transfer of funds from one budget unit, or spending agency, to another budget unit is not authorized. The section relates to the transfer of an allowance "for one budget class to an allowance for another such budget class within the same allotment"—i.e., an allotment to a spending agency. "Budget class", as defined by the act, title 1, § 3(4), means "a kind of expenditure denoting a class of services or commodities purchased or properties acquired, as specified in the classification of expenditures prescribed". When budget units, or spending agencies, present to the Legislature requests for appropriations, they specify the purposes for which the appropriations are to be used—such as the payment of salaries and payments to be made for office supplies, commodities, and equipment to be purchased or property to be acquired. What this section means, and all it means, is that, if the budget unit finds that it does not need the amount specified for the payment of salaries for that purpose but does need more than the amount specified for the purchase of commodities, it may transfer a portion of the amount allotted for salaries to the allotment made for the purchase of commodities. These transfers are made "within the same allotment" in order to accomplish the purpose of the allotment to the budget unit.

Section 19 of Title IX provides that two or more departments "may unite in cooperative work along lines germane to the functions of such departments and otherwise secure from each other supplies and services, and the heads thereof may agree among themselves on the distribution of the expense to be incurred". What the provisions of this section mean is that, when one department has functions which are germane to those of another department, the two departments, having a common aim in view, may arrange to work together or to cooperate on some project or program which will be of mutual benefit to both, and may secure from each other supplies and services for this common purpose, and by agreement apportion the share of the expense to be borne by each.

There is no constitutional provision prohibiting the Legislature from authorizing such a procedure, and, since the Legislature has absolute control over its finances and that of the departments and agencies created by it, the objections to the provisions above referred to in Act 111 of 1942 have no merit.

We find that Act 111 of 1942 does not violate Sections 1 and 2, Article II, or Article IV, of the Constitution.

■■■■ 5. It was held that Act 111 of 1942 violates Section 32 of Article III of the Constitution, which reads as follows:

"The Legislature is authorized to provide for the merger or consolidation into one department of all executive and administrative offices, boards or commissions, whether created in this Constitution or otherwise, whose duties or functions are of a similar nature or character, and, in the event of any such consolidation or merger,

to reduce the number of officers at the end of their current term."

The trial court held that the act violates this provision of the Constitution for three reasons, the first being that it fails to consolidate or merge into one department all executive or administrative agencies of the State—in other words, that the act provides for the merger or consolidation into one department of some, but not all, of the administrative offices. The answer is that the Legislature is "authorized" to merge into one department all such departments if it sees fit. But it is not prohibited from merging two or more of them into one department without reference to the other departments in the same category. Furthermore, the fact is that the act does not purport to merge any of the departments into one department. What it does, and all it does, is to transfer certain functions of certain named departments to the Department of Finance.

The second reason named is that the "agencies sought to be merged and consolidated do not have duties and functions of a similar nature and character". As we have said, the act does not merge or consolidate any State agencies or departments.

The third reason assigned by the court is that the act provides for no reduction of officers of the State. This objection would be valid only in case there had been a merger of any of the State departments or agencies into another department or agency, and, as we have stated, there was no such merger.

We find that Act 111 of 1942 does not violate Section 32, Article III of the Constitution.

The points discussed above herein are the only ones passed upon by the district judge.

■■■ Counsel for plaintiff raise certain other objections to the act, among them being that Section 2, Title I of the act, violates Paragraphs 2 and 3, Section 30, Article III, and Section 26(3), Article VI of the Constitution, "when an attempt is made to abolish the State Printing Board and to transfer its functions to the Department of Finance."

No attempt was made to abolish the State Printing Board. That Board was not abolished. The act transfers to the Department of Finance certain functions of the Printing Board, which had been conferred upon it by the Legislature. The State Printing Board was not created by the Constitution, but by the Legislature. Paragraph 2, Section 30, Article III of the Constitution, merely provides that "All stationery, printing, paper, fuel and other supplies necessary for use in all the departments of government shall be purchased or contracted for of the the lowest responsible bidder and under such regulations as are or may be prescribed by law". Paragraph 3 of that section provides that no member or officer of any department of government shall be in any way interested in such contracts. Section 26(3), Article VI of the Constitution, provides that "The State Printing Board shall furnish to the Department of Revenue and the Supervisor

of Public Funds their printing, stationery and office supplies, under the State printing contracts". It is provided elsewhere in the Constitution that all printing, stationery, etc., shall be furnished to designated officers and departments by the State Printing Board.

The State Printing Board, not having been abolished or merged into the Department of Finance, may still supply the printing as it has always done. So far as the State Printing Board is concerned, Act 111 of 1942 merely transferred certain of its functions to the Department of Finance.

It was contended by counsel that Act 111 of 1942 violates Sections 12 and 13 of Article IV of the Constitution "by attempting to authorize the Department of Finance to settle all claims against the State and to issue warrants for the payment thereof from the State Treasury, as will more fully appear by the provisions of paragraph f, Section 1, Title II of the statute".

The act does not authorize, or attempt to authorize, the Department of Finance to settle claims against the State. Counsel do not refer to the provisions of the act which they say authorize the Department of Finance to settle claims against the State, except Paragraph (f), Section 1, Title II of the statute, which reads in part as follows:

"Settling all claims against the State and issuing warrants for payment thereof from the State Treasury."

Section 1, Title II of the act, confers upon the Department of Finance certain functions "in relation to" certain designated matters, one of which is the "Settling all claims against the State and issuing warrants for payment thereof from the State Treasury".

The act goes no further than to confer upon the Department of Finance certain functions "in relation to" the settling of claims against the State and the issuing of warrants for their payment. It does not authorize the Department of Finance to settle claims. Title VII of the act relates to the "Payment Of Claims". It is provided in Section 1 of that title that no money of the State "shall be withdrawn from the Treasury or otherwise disbursed for any purpose except to pay obligations under expenditures authorized either by appropriation, dedication of revenues or other lawful authority and pursuant to allotment as in this Act provided and not in excess of the amount so authorized". The succeeding sections of the title relate merely to the details or procedures for the payment of such claims as are authorized by law to be paid and for which the State and its agencies are responsible and for which funds have been appropriated or dedicated.

We think Act 111 of 1942 is constitutional.

For the reasons assigned, the judgment appealed from is reversed, and it is ordered that the preliminary writs of injunction issued herein be dissolved and set aside, and plaintiff's suit dismissed at his costs.

HIGGINS, Justice (concurring).

As I understand the majority opinion, there was not any evidence introduced in this case to show that there was any fraud or wrongdoing on the part of the officials and employees of the Legislature in handling the amendments to the bill in question and, therefore, even though the House Journal did not fully set forth just what procedure was followed in their adoption, the presumption is that they were validly adopted, since the Constitution did not specifically require entry in the House Journals of the action of the House that was not included therein.

I concur in this view because the attention of the members of the House was specifically called to these omissions by the members of the Senate and the bill returned with the amendments for such action as the House might deem necessary. The members of the House returned the bill with its amendments to the Senate without any further action, thus showing that the members of the House considered that the amendments had been regularly and legally adopted and that the minutes in the House Journal sufficiently indicated this fact.

It is also my understanding that the constitutionality of the statute is sustained not on the theory that the Legislature exercised its constitutional power to merge and consolidate state offices and departments of Government because it is conceded in the briefs that while express reference is made to the constitutional article authorizing merging and consolidation of offices and

departments of the State, this was not as a matter of fact done. As I construe the majority opinion, the functions, duties, and responsibilities of constitutional State officials are not taken away from them and placed under the control of the Director of Finance.

In the prevailing opinion, it is stated that the Director of Finance and his assistants would act as aides and adjuncts to the other constitutional officers in discharging and performing the duties, functions, and responsibilities of their respective offices. Since the Legislature has the authority under the Constitution to enact laws regulating the finances or fisc of the State, the statute in question is a constitutional expression of legislative will, provided it is not construed to mean that the Director of Finance or the members of his Department can, by the management of the finances of the State, for all practical purposes and effects, deprive an official occupying a constitutionally created office of the duties, functions, and responsibilities of his office. In short, the Legislature has no authority to deprive an official occupying a constitutionally created office of the authority and rights vested in him by virtue of the Constitution. The statute in question must be susceptible of the interpretation placed upon it by the majority opinion, as above outlined, since none of the state officials are before the Court complaining. It is the duty of the Court to avoid a construction of the statute that would make it unconstitutional and to resolve all doubts as to its legality in favor of its validity.

For the reasons above stated, I respectfully concur in the decree.

. FOURNET, Justice (dissenting).

The object of this suit is to enjoin the enforcement of Act No. 111 of 1942, and the further expenditure of the $1,258,512 appropriated by the legislature for the biennium 1942-1944 to carry the act into effect.

The basis of the action is that Act No. 111 of 1942 is null and void because (1) it violates numerous sections of various articles of the constitution, and (2) it was never legally adopted since 36 House floor amendments incorporated into and admittedly forming a part of the statute as purportedly passed by both houses were never approved by the House of Representatives.

In the majority opinion it is pointed out that: "According to its title, Act 111 of 1942 is one providing for a Fiscal Code for the State of Louisiana, and providing for all procedures necessary to establish a unified, comprehensive code of procedures for the financial administration of the State and all State agencies." But this title is misleading and not indicative of the real object of the Act, in violation of Section 16 of Article III of the constitution, for a mere reading of the act will show its object is to constitute and create a Department of Finance (Section 1), and nowhere in the entire body of the act is the Fiscal Code even so much as mentioned, with the exception of the notation in Section 2, under the heading "Short Title," that "This

Act shall be known and may be cited as 'The Fiscal Code of 1942.'"

The title of the act, in addition to declaring it is one providing for a Fiscal Code and the creation of a Department of Finance, also states it is one *"providing for the merger or consolidation into one department * * * of all of the * * * functions, property, rights, credits, records, appropriations, personnel, assets and liabilities of all executive and administrative offices, boards, commissions and other State agencies* now existing whether created in the Constitution or otherwise where said duties and functions are of a similar nature or character to the functions and duties provided herein conformable to the provisions of Article III Section 32 and Article V Section 1 of the Constitution of Louisiana and providing for the creation of additional functions, duties and procedures of said Department of Finance * * *."* The title also provides "said Department shall be successor to Department of Finance as created by Act 47 [48] of 1940 * * *." (Brackets and italics mine.)

Inasmuch as one of the objects of Act No. 111 of 1942, as expressed in its title, is that it shall be successor to the Department of Finance created by Act 47 (48) of 1940, I deem it necessary to consider the present act in the light of its predecessor.

It appears that in 1940 the legislature passed Act No. 384, submitting to the electorate of this state a constitutional amendment reorganizing the executive branch of our state government by the establishment of a comprehensive system

to administer its administrative and financial affairs. At the same session, Acts Nos. 47 and 48 were adopted as enabling acts. The latter act sought to create a Department of Finance that was declared invalid in the case of Ricks v. Close, 201 La. 242, 9 So.2d 534, for the reason that it fell when its parent act (Act No. 384 of 1940), upon which it depended for its constitutional existence, was declared to be null and void. Graham v. Jones, 198 La. 507, 3 So.2d 761. Despite this fact, as a careful study and analysis of Act No. 111 of 1942 and Act 48 of 1940 will demonstrate, the 1942 legislature, *without the aid of additional constitutional authority,* and while the constitutionality of Act No. 48 was before this court on rehearing in the Ricks case, under the pretext of merging and consolidating departments of the state government as authorized by Article 3, Section 32 of 1921, adopted its Act No. 111 of 1942, creating a new Department of Finance, in violation of Section 1 of Article V of the constitution.

While Section 1 of Article V of the constitution, after declaring "The executive department shall consist of a Governor, Lieutenant Governor, Auditor, Treasurer, Secretary of State, Register of the Land Office, Commissioner of Agriculture and Immigration, and Commissioner of Conservation," does authorize the legislature to consolidate any of these offices "except that of Governor, Lieutenant Governor, Treasurer, and Secretary of State," *it does not authorize the legislature to create a new department of the state* such as was done in this case—that is, the Department of Finance.

This court, in its recent decision in the Ricks case [201 La. 242, 9 So.2d 538], held that "The provisions in Acts Nos. 47 and 48, *creating the Department of Finance* as an administrative department of the Office of Governor, are violative of Section 1 of Article V of the Constitution." (Italics mine.)

These acts (48 of 1940 and 111 of 1942) are, for all intents and purposes, the same. In fact, Act No. 111 of 1942 is far more extensive and sweeping than was the former act, affecting, as it does, the functions and duties of our elected and administrative officials and reaching so far into every sphere of our state government that only the judiciary and a few named departments escape its grasp. It is not hard to imagine that by the simple means of a single amendment, these too, in time, will be included if the act is permitted to stand.

Moreover, the legislature, under the guise of merging and consolidating into one department all of the executive and administrative offices, boards, commissions, and other state agencies now existing, whose duties and functions are of a similar nature or character, as authorized by Section 32 of Article III of the constitution, has, in fact, stripped them of certain of the functions and duties delegated to them by the constitution in order to give life to the new department of state government created by it without, in truth, merging or consolidating these administrative offices, boards, commissions, and agencies. This is not only in direct conflict with the express letter of the constitution, but it is an

ostentatious flaunting of its very spirit as well.

Act No. 111 of 1942 is further violative of the mandatory command in Section 32 of Article III of the constitution "to reduce the number of officers at the end of their current term" in the event of such consolidation or merger, for the act not only fails to make any provision for the reduction of officers at the end of any term, but creates, judging from the specific provisions of the act and the appropriation of $1,258,512 for the 1942-1944 biennium, a number of new officers whose salaries range from $8,000 a year down, to say nothing of the fact that the duties and functions of the various executive and administrative offices, boards, commissions, and agencies thus sought to be merged are far from similar in either nature or character.

In the majority opinion it is conceded that if by the adoption of Act No. 111 of 1942 the legislature did in fact create a new executive department or has stripped the executive and administrative offices, boards, and other agencies now existing of their duties and functions without reducing the offices at the end of their current term and without in fact merging these offices, as contemplated by Section 32 of Article III of the Constitution of 1921, the act would be unconstitutional. But in order to circumvent these constitutional barriers, it is declared in the majority opinion that the act does not in fact create a new executive department and that it does not in fact strip any offices in the executive department of the governor of any of the duties or functions conferred

upon them, but instead, states the author of the majority opinion: "Clearly * * * the functions of the Director of Finance and the officers serving in or under that department are to assist the Governor and the Legislature in gathering the data which are to form the basis of the appropriations for the different departments and agencies of the State. In no way may these officers dictate or dominate the financial policies of either the Executive or the Legislative Department of the State. The Department of Finance is in no sense, therefore, a department of the Executive Branch of the government. *It is no more so than would be an expert accountant or auditor employed by the Executive Department of the State to gather data necessary to guide that department in formulating its financial plans.*" However, the same author after reiterating "that the act does not purport to merge any of the departments into one department," contradicts this statement by concluding: *"What it does, and all it does, is to transfer certain functions of certain named departments to the Department of Finance."* (Italics mine.)

It is my opinion that therein lies the fallacy of the majority opinion, unless we are to assume that the sponsors of Act No. 111 of 1942 and the members of the legislature did not know what they were doing, for, as hereinabove pointed out, it is specifically declared in the very title of the act that one of its objects is to provide *"for the merger or consolidation into one department * * * of all of the * * * functions, property, rights, credits, records,*

*appropriations, personnel, assets and liabilities of all executive and administrative offices, boards, commissions and other State agencies now existing whether created in the Constitution or otherwise where said duties and functions are of a similar nature or character to the functions and duties provided herein conformable to the provisions of Article III Section 32 and Article V Section 1 of the Constitution of Louisiana * * *."* (Italics mine.)

Furthermore, immediately following this title, in a preamble, the sponsors and the members of the legislature stipulate:

"Whereas, the Constitution of Louisiana, in Article III, Section 32 and Article V, Section 1 recognizes the need of keeping the executive and administrative departments of the State abreast of the times and capable of fulfilling the social and economic demands made upon the State, and, for that purpose, authorizes the reorganization of the executive and administrative departments by the merger or consolidation into the Department of Finance of all executive and administrative offices, boards; or commissions, whether created in the Constitution or otherwise, whose duties, or functions are of a similar nature or character to those established in said Department;

"Therefore, the Legislature at this time deems it expedient and proper to consolidate into a department to be known as the Department of Finance the functions and powers hereinafter enumerated, heretofore exercised wholly or in part by other executive and administrative offices, boards,

commissions, or other State agencies, as authorized by the Constitution."

That the legislators were cognizant of the purposes of the act and its sweeping effect is reflected by the following comment of one of its members, Representative Theo. F. Cangelosi, in the explanation of his vote (extended into the House Journal at page 1056):

"There are serious doubts in my mind as to the advisability of giving any Department of the State such extensive and far-reaching powers as are given the Department of Finance under the Fiscal Code. This is especially questionable when the head of the Department having such power and control is an appointive official and not elective by the people. *I particularly doubt the wisdom of giving such powers of control and supervision over all departments and institutions including those departments whose heads are elected by the people."* (Italics mine.)

A mere reading of the act will completely refute the conclusions that the functions of the Director of Finance are no more than would be those of an expert accountant or auditor employed by the executive department of the state to gather data to aid in the formulation of the financial policies of the state, or that the Director of Finance and those under him act only as aides and adjuncts to the other constitutional officers in discharging and performing the duties and functions of their offices.

I entertain serious doubt that the legislature would have adopted Act No. 111

of 1942 thus emasculated. In any event, I have no doubt that they would not have appropriated the stupendous amount of $1,-258,512 for the employment of expert accountants or auditors to guide the executive department in formulating its financial plans. An examination of the general appropriation act for the same period shows that the legislature appropriated the sum of $200,000 ($100,000 for each year) for the operation of the Supervisor of Public Funds. A further examination of the same appropriation act shows that, *added* to the appropriation of the Supervisor of Public Funds, the appropriations for the entire executive department created under Section 1 of Article V of the Constitution of 1921, excepting the Department of Conservation, that is, the Governor, Lieutenant Governor, Auditor, Treasurer, Secretary of State, Register of the Land Office, and Commissioner of Agriculture, only slightly exceed the appropriation for this new department created by Act No. 111 of 1942, which the majority opinion, in effect, declares is no more than an adjunct or aide to the other executive offices. In addition to this, we find that the salaries to be paid the Director of Finance and certain other subordinate officers to be created by him exceeds that paid to any of the executive officers created under the constitution, the governor alone excepted.

By way of comparison, we find the appropriation for these same named executive departments for the biennium 1932-1934, but *including* the Supervisor of Public Accounts, amounted to only $578,695. In other words, the amount appropriated to operate the so-called "Fiscal Code" would have been sufficient not only to operate all of these executive departments for the biennium 1932-1934, but, in addition, there would have been enough left over under the same appropriation act, to defray the expenses of the Soldiers' Home, New Orleans Hospital and Dispensary for Women and Children, State School for the Blind, State School for the Deaf, State Industrial School for Girls, Board of Charities and Corrections, Louisiana Tuberculosis Commission, and the Milne Home. See, page 64 et seq., of the Acts of 1932.

Without discussing in detail the merits of the further contention urged by the plaintiff that the act is also violative of the constitutional mandate that "Every law enacted by the Legislature shall embrace but one object, and shall have a title indicative of such object," Section 16 of Article III, suffice it to say that a study of the act reveals that in addition to having a title entirely misleading as to the real object of the act, as hereinabove pointed out, it is so intricate, involves so many departments and agencies of the state, and extends into so many and diverse spheres of government that it is really difficult to determine just how many objects it does embrace and just what objects its title is indicative of. I think the authors of the act themselves were cognizant of the plurality of its objects, for the repealing clause of the title abolishes "all laws or parts of laws in conflict or inconsistent with this Act and * * * the functions of certain agencies as required to effectuate the *objects* of this Act," while in the

clause referring to the creation of the additional functions and duties that are to be conferred upon this new department of the state, it is stated these shall be such as are "necessary to effectuate the said *objects and purposes*." (Italics mine.)

When this question was under consideration in the case of Graham v. Jones, supra [198 La. 507, 3 So.2d 774], this court, in disposing of the same, said:

"In submitting Act 384 of 1940 to this test, we are first confronted with its title, which specifically points out the plural character of the proposed changes in the fundamental law. The title of the statute reads in part: 'Proposing amendments to the Constitution of Louisiana, relative to the form of organization of the Executive Department of the State government and a unified and comprehensive · system of financial administration, by articles and sections as follows: * * *.'

"It will be readily observed that according to the title of Act 384 of 1940, the text thereof is to embrace *proposed amendments* and not merely *one proposed amendment* to the Constitution. The title of the statute also discloses that the object of the proposed amendments is to change not only the form of the State government, but also to establish a new system of financial administration."

Another striking example of the unconstitutionality of this act is evidenced by the fact that it authorizes the transfer of appropriations, working capital, and property from one agency of the state to another. We held in the case of Graham v. Jones,

supra, that such functions are within the exclusive province of the legislature and, therefore, that the transfer of them to the new executive department of state sought to be created was in violation of Articles II and IV of the constitution.

I am also of the opinion that the act is null and void for the reason that the 36 House floor amendments incorporated into and admittedly forming a part of the statute as purportedly passed by both houses were never, in fact, legally adopted by the House of Representatives.

Under the mandatory provisions of the Constitution of 1921, each house is compelled to keep *"a journal of its proceedings,* and cause the same to be published immediately after the close of the session," the original being preserved in the offices of the Secretary of State. Section 15 of Article III. "The recitals in legislative journals are conclusive as to matters which the constitution requires to be entered therein; and cannot be impeached by verbal statements. or other parol or extrinsic evidence, even for fraud or mistake * * *. * * * Nor can a journal be contradicted or amplified by loose memoranda made by clerical officers of the legislature." 59 C.J. 634, Section 198. See, also, State ex rel. Porterie v. Smith, 184 La. 263, 166 So. 72, and the cases therein cited. (Italics mine.)

While the House Journal for 1942 affirmatively shows its Bill No. 40 (Act No. 111) was passed "as amended," it fails to show what disposition the House made of the 36 floor amendments sent up for con-

sideration when the bill was up for third reading and final passage. See pages 1051-1056 of the House Journal for 1942.

In the majority opinion it is aptly pointed out that "* * * if the 36 House floor amendments were never approved by the House, the bill is invalid, because it is conceded that those amendments were incorporated into, and therefore became a part of, the bill as finally adopted by both houses * * *," but the author of the majority opinion concluded "* * * *the presumption is that the House did approve the amendments; and the fact that the House Journal fails to show what action, if any, was taken on the amendments affords no ground for holding that the amendments were not in fact approved. We must necessarily presume that they were approved."* (Italics mine.)

The mere fact that the House finally passed the bill "as amended" does not necessarily indicate the 36 floor amendments were ever taken into consideration, much less adopted, for it appears from Page 469 of the House Journal that prior thereto, on June 5, the bill had been reported favorably by Section C of the House Committee on Judiciary with 8 committee amendments which were properly adopted by the House upon the motion of Representative Heintz. And the fact that the Senate, upon a substitute motion, when the matter was called to its attention by one of the senators who objected to the reading of the bill for final passage because there was nothing in the House Journal to show what disposition the House had made of these 36 floor amend-ments, returned the bill to the House for correction to conform with the original bill as amended by the 8 committee amendments or else for the formal adoption of the 36 floor amendments, in my opinion, clearly indicates these amendments were never even considered by the House, for the clerk of the House, on the same day, returned the bill to the Senate with the notation he was doing so at the direction of the Speaker and members of the House, although the Journal fails to reflect any such authorization was given the clerk by the House and also fails to reflect that its minute entries were ever corrected to show what action, if any, had been taken on these 36 floor amendments. Under these circumstances, I do not believe we are justified in assuming these 36 floor amendments were adopted by the House.

It is my further opinion that the constitutional mandate requiring each house to keep a journal of its proceedings contemplates that this journal shall include *all of its proceedings, in conformity with the rules and regulations adopted by the two houses for the enactment of legislation.* No one will doubt there is hardly a more elementary proceeding in democratic assemblies than the right of each and every member thereof to offer amendments to any proposed legislation for the consideration of the whole assembly prior to the final passage of such legislation. Consequently any sanction of laxity in the accurate reflection of the orderly adoption or rejection of such amendments in these journals, will ultimately result in the enactment of legislation so conglomerated

and confused that it will be impossible to determine in just what condition the bill was finally passed. I think the necessity for keeping an accurate record of such proceedings is not only accentuated by the very rules adopted by each house of the legislative branch of our government requiring that these proceedings be actually and accurately entered in the journal, but also by the fact that a casual check of any of the journals of either of the two houses of the legislature for any of its sessions will disclose these rules have always been strictly adhered to. It seems to me that in the face of this unswerving adherence by both houses in entering every action taken on each and every amendment offered in their respective journals, the failure of the House Journal for the 1942 session to reflect such an entry in this one instance can only mean that no action was ever actually taken on these amendments. Certainly the manner in which the House ignored the Senate's request that the matter be corrected, as well as everything else in this particular case, points in that direction.

It is my opinion the injunctive relief granted the plaintiff by the lower court should be maintained and I, therefore, respectfully dissent from the views expressed in the majority opinion.

PONDER, Justice (dissenting).

It is stated in the majority opinion that "a reading of the act discloses that it does not have the drastic and far-reaching effect attributed to it." It is also stated therein that "in no way may these officers

dictate or dominate the financial policies of either the Executive or the Legislative Department of the State." As I take it, the prevailing opinion is to the effect that the Director of Finance and his assistants are only authorized to act as aides and adjuncts to the constitutional officers in discharging and performing their duties and functions.

The Act is a lengthy one, and it could serve no purpose for me to quote isolated expressions contained therein to support the views I entertain. In fact, in order to gather the import of the Act, every provision and every sentence contained therein would require consideration. From my reading of the Act, I cannot agree that it has the restricted effect placed upon it by the majority opinion. If I did so, I would have subscribed to the prevailing opinion. I believe that the Legislature entertained the same views that I hold; that is, the Act was intended to have a far-reaching effect. I am supported in this observation by the following provision stated in the title of the Act:

"providing for the transfer of functions, properties, records, appropriations and obligations from existing officers, boards, commissions and other State agencies to the Department of Finance;" and

"providing for the merger or consolidation into one department to be known as the Department of Finance of all of the hereinabove enumerated functions, property, rights, credits, records, appropriations, personnel, assets and liabilities of all executive and administrative offices,

boards, commissions and other State agencies now existing whether created in the Constitution or otherwise where said duties and functions are of a similar nature or character to the functions and duties provided herein conformable to the provisions of Article III Section 32 and Article V Section 1 of the Constitution of Louisiana and providing for the creation of additional functions, duties and procedures of said Department of Finance germane to the purpose of this Act and necessary to effectuate the said objects and purposes;"

Undoubtedly, the Legislature was of the impression that the Act had such a far reaching effect that it was necessary to consolidate or merge the functions of various branches of the Executive Department in conformity with the provisions of Article III Section 32 and Article V Section 1 of the Constitution. I do not believe under these constitutional provisions that part of the functions of the various Executive Offices can be consolidated without doing violence to the Constitution. The Constitution sets out the various executive offices and only authorizes a change in these offices by a merger or consolidation of some of them.

It is conceded in the majority opinion that an office cannot be added to the Executive Department of the State for the reason that the Constitution specifically designates the offices which compose the Executive Department. As I understand the Act, it adds an office to the Executive Department and in no way attempts to consolidate or merge the offices of the Executive Department as authorized by the

Constitution. In fact, it seeks to take away various functions of these offices and places them under the direction and control of the Department of Finance, a new office created by the Act, which is in effect an added office or department to the Executive Branch of the Government in violation of the aforementioned constitutional provisions.

For these reasons, I respectfully dissent.