274 So.2d 716 (1973)
Morgan W. WALKER et al.
v.
LOUISIANA EXPRESSWAY AUTHORITY and the Honorable John J. McKeithen, Governor, State of Louisiana.
No. 5423.
Court of Appeal of Louisiana, Fourth Circuit.
March 7, 1973.
Rehearings Denied April 3, 1973.
Writs Denied May 17, 1973.
*719 Stafford, Pitts & Stafford, Grove Stafford, Jr., Alexandria, Gold, Hall, Hammill & Little, Henry B. Bruser, III, Baton Rouge, for plaintiffs-appellants.
Holloway, Baker, Culpepper, Brunson & Cooper, William H. Baker, Jonesboro, Calogero & Kronlage, Charles A. Kronlage, Jr., New Orleans, John E. Jackson, Asst. Atty. Gen., for defendants-appellees.
Before LEMMON, GULOTTA and STOULIG, JJ.
LEMMON, Judge.
This appeal involves the "North-South Toll Road." Morgan W. Walker and Chester D. Wells filed suit to contest the legality of the proceedings of the Louisiana Expressway Authority (L.E.A.), which culminated in the July 26, 1971 adoption of a resolution finding the expressway system described in Act No. 246 of 1970 to be financially feasible. In addition to questioning whether the finding was arbitrary, capricious or without foundation in fact, plaintiffs also disputed the constitutionality of the Act and the legality of issuing general obligation bonds of the State to finance construction of the expressway. The trial court dismissed the suit after a trial on the merits, and plaintiffs appealed.
The L.E.A. was created by Act No. 232 of 1954 to "construct, maintain, repair and operate expressway projects" as may be approved. See R.S. 48:1251 et seq. That Act granted the L.E.A. the power to issue revenue bonds, which were expressly payable only from revenues and were not a pledge of the faith and credit of the State.
In 1970 the Legislature passed Acts Nos. 246 and 247, which contained the following pertinent provisions:
1. Section 2 directed the L.E.A. (a) to proceed forthwith with studies to plan and construct an expressway system consisting of three separate projects described in Section 1; (b) to request issuance of bonds to finance the costs of construction, if the L.E.A. determined the system to be financially feasible and the Governor concurred in this determination; and (c) to construct the system and place it in use.
2. Section 1 defined "financially feasible" as
". . . a finding and determination by the Authority, as prescribed in Section 5 hereof, that the average gross revenues of such expressway system will be equal to at least sixty-six *720 and two-thirds per centum of the average annual debt service requirement."
3. Section 2 further required the L.E.A. to construct the three projects "in conformity with design and other standards at least comparable to those of existing interstate routes currently in use in the state."
4. Section 3 authorized the L.E.A. "to expend for each project not in excess of" certain stipulated amounts. It further required all three projects to be approved and authorized at the same time and to be commenced and constructed upon the determination that the system is financially feasible.
5. Section 4 directed the State Bond Commission, upon the L.E.A.'s filing a resolution determining the system to be financially feasible, to issue general obligation bonds of the State in an amount not exceeding the amounts provided in Section 3. For the payment of the bonds the full faith and credit of the State was irrevocably pledged.
6. Section 5 provided the procedure for the resolution by the Authority, concurrence by the Governor, and publication of notice, and further provided a period within which any person in interest could attack the legality of the proceedings or the finding and determination by the L.E.A.
Plaintiffs do not dispute in this court the procedural correctness and timeliness of the steps outlined in Section 5. Neither do defendants dispute that this suit was timely filed by parties in interest.

CONSTITUTIONALITY OF ACT NO. 246
Plaintiffs first contend that Section 10 of Act No. 246 purports to amend Act No. 10 of the 1968 Extraordinary Session (the Five-Year Plan), which constitutes a second object in violation of Const. Article 3, Section 16.[1] They further contend in this regard that the title does not indicate this object.
The title of Act No. 246 reads:

"An Act
"Relating to the Louisiana Expressway Authority; defining certain terms used in the Act; authorizing the Authority to construct certain expressway projects constituting an expressway system at a maximum cost of Three Hundred Thirty-one Million Dollars, subject to increase under certain conditions provided in the Act; authorizing and directing the state bond commission, in order to obtain funds for the construction, to issue general obligation bonds of the state in accordance with R.S. 39:1401 through R.S. 39:1406 and R.S. 39:1361 through R.S. 39:1366, payable from the bond security and redemption fund; providing for a finding by the Authority, concurred in by the governor, that the expressway system is financially feasible, as such term is defined in the Act, as a condition for issuance of the bonds; providing for charging and collection of tolls for use of the expressway projects as long as bonds issued in connection therewith are outstanding, unless the federal government pays or provides for the payment of the bonded indebtedness or the bonds are otherwise paid; providing the governor is prevented from removing the tolls or having the debt assumed by the department of highways or any other state agency unless the bonds are paid or provision is made by the federal government for their payment and otherwise providing with respect to the Authority and the expressway system authorized herein."
*721 Section 10 of the Act provides in pertinent part:
"Upon the Authority's filing with the state bond commission a certified copy of the resolution that the expressway system is financially feasible and of the governor's concurrence therein, and upon the receipt by the state bond commission of an opinion of nationally recognized bond counsel, that, in the opinion of such bond counsel, the provisions of this Act are legal and valid, and that if proceedings for the issuance of the bonds under the provisions of this Act and other applicable law are duly and properly taken, such bonds will constitute valid and legally binding general obligations of the state of Louisiana, for the payment of which as to principal, premium, if any, and interest the full faith and credit of the state will be pledged, the following projects shall be deleted and removed from the five-year capital outlay highway budget contained in Act 10 of the 1968 Extraordinary Session. * * *" (Emphasis supplied)
The cited constitutional provision requires that an act embrace but one object. We first observe that the elimination of scheduled construction of free, competitive roads is not an object separate and distinct from the construction of a toll road, but rather is a closely related object. Inasmuch as construction of free roads in the area of the toll road could defeat the feasibility of the project by frustrating collection of the tolls necessary to meet the annual debt service, elimination of this construction was consistent with and related to the object of constructing a financially feasible toll road. Additionally, legislative adoption of the toll road project rendered certain construction authorized under the Five-Year Plan unnecessary and superfluous, since the Act changed the situation that had existed when the Five-Year Plan was adopted.
Moreover, the provision deleting construction of free roads is in the nature of a repealing clause, which is not a separate and distinct object within the constitutional prohibition against an act embracing more than one object. Wall v. Close, 203 La. 345, 14 So.2d 19 (1943).
Concluding that the Act embraces but one object, we also reject plaintiff's argument that the title of the Act is not "indicative of such object." The Supreme Court in Parish of Jefferson v. Louisiana Dept. of Corr., 259 La. 1063, 254 So.2d 582 (1971) set out the following general principles in this regard:
"Where acts of the legislature are under attack, courts should, in keeping with the general policy we have often expressed, seek to effectuate the legislative intent and resolve any doubt in favor of constitutionality. To this end a liberal construction has been applied to the title-body clause of the constitution. It is only where the variance in the provisions of the act is palpable and totally irreconcilable with its title, or where both title and body express two distinct subjects, that the intention of the legislature will be held to be in conflict with the constitution. It is not the purpose of the title-body clause of the constitution to require that the title be an index to the contents of the act. It is sufficient that the title of the act express its object in general terms. All things proper and necessary to carry out the general object stated in the title are deemed to be within the scope of the title." p. 596 (Citations omitted, Emphasis supplied)
Applying these principles to the present case, we do not find the provisions of the Act are irreconcilable with the title or that the title and body express two different objects.
The primary objective of the title-body clause is to give members of the Legislature and the public fair notice of the scope of proposed legislation. A. & M. Pest Control Service, Inc. v. LaBurre, 247 La. 315, 170 So.2d 855 (1965). Certainly, the Legislature should not be deceived into *722 passing (nor the public deceitfully deprived of the opportunity of opposing passage of) provisions which are not indicated by the title of the bill. But in this case the Legislature and the public were provided with fair notice of the object and scope of the Act by its title, and the purpose of the constitutional provision was not frustrated.
We note in passing that even if Section 10 were unconstitutional, the balance of Act No. 246 would not be affected because of severability clause contained in Section 11.
Plaintiffs secondly contend that Act No. 246 unconstitutionally delegates legislative authority to the L.E.A. and the Governor by granting them authority to determine the financial feasibility of the project without sufficient guidelines for that determination or sufficient controls over the exercise of the delegated authority.
The Legislature may properly make the operation or application of a statute contingent upon the existence of certain facts and conditions and in this regard may delegate to an administrative board the power to determine such facts and conditions and to carry out the terms of the statute. City of Alexandria v. Alexandria Fire Fighters Assn., 220 La. 754, 57 So.2d 673 (1952). In Schwegmann Brothers Giant Super Mkts. v. McCrory, 237 La. 768, 112 So.2d 606 (1959), the Supreme Court stated:
"So long as the regulation or action of the official or board authorized by statute does not in effect determine what the law shall be, or involve the exercise of primary and independent discretion, but only determines within prescribed limits some fact upon which the law by its own terms operates, such regulation is administrative and not legislative in its nature. * * *" p. 613.
Act No. 246 contains the specific definition of financial feasibility, annual gross revenues, net revenues, annual debt service requirement and other pertinent terms involved in the determination of financial feasibility. It further sets forth the specific location of the various corridors comprising the system, the design and other construction standards, the maximum authorized expenditure for each project and the method of financing the system. We conclude that the Act contains "prescribed limits" and sufficient guidelines and parameters within which the L.E.A. must exercise its fact finding authority. Accordingly, this determination of financial feasibility within the prescribed limits constitutes an administrative, rather than a legislative, function.
However, plaintiffs assert that the Governor was delegated equal power to make the determination and that the Act contains no controls or guidelines on the exercise of this authority by the Governor.
We disagree. The Act directs the L.E. A. and not the Governor to determine the financial feasibility, and further conditions the request for the issuance of bonds upon this determination by the L.E.A. as concurred in by the Governor. The Governor's concurrence is simply a check upon the authority delegated to the L.E.A., and the guidelines applicable to this concurrence are implicitly the same as those imposed on the L.E.A.
Finally, plaintiffs argue that Section 10 of Act No. 246 unconstitutionally delegates to bond counsel the judicial authority to pass upon the legality of the L. E.A. proceedings and renders the legislative amendment of the Five-Year Plan dependent upon future actions of a private individual. We find no merit in this contention.
Section 10 simply eliminates certain construction under the Five-Year Plan upon the happening of certain specified conditions. The Legislature in passing Act No. 246 conclusively made the decision to eliminate this construction upon the L.E.A.'s finding the project financially feasible and the Governor's concurring in this finding. In requiring the legal opinion of a bonding *723 consultant, the Legislature did not delegate law making or judicial power to the consultant, but simply required an additional advisory opinion before the cancellation of the free road construction became effective. This opinion in no way constitutes judicial approval of the Act or the L.E.A.'s proceedings, but merely serves as a further check upon the administrative authority granted to the L.E.A.

MAXIMUM EXPENDITURE
As to the maximum expenditure for the project, Section 3 of the Act provides as follows:
"The Authority is hereby authorized to construct the following expressway projects and to expend for each project not in excess of the amounts shown:

 Expressway Project Amount
1. Shreveport-Alexandria Project $128,000,000
2. Alexandria-Northeast Louisiana
 Project 116,000,000
3. Alexandria-Opelousas Project 87,000,000
 _____________
 (Total $331,000,000)

"Provided, however, that the maximum amount that may be expended for each expressway project may be increased, in the sound discretion of the Authority, in each case by an amount not to exceed ten per centum of the amounts above shown, if at the time the expressway project is to be constructed, construction costs are such that, in the opinion of the Authority, the cost of construction of the expressway project would be in excess of the amounts above shown." (Total supplied)
In its resolution determining the project to be financially feasible, the L.E.A. recited:
"Section 9. That, based on the Financial Feasibility Report, dated July 23, 1971, submitted to the Authority by the Financial Consultants (hereinafter the "Financial Feasibility Report"), marked Attachment E and annexed hereto and by this reference incorporated in full herein, it is hereby found and determined that the total costs of each Project within the Expressway System, including interest on the bonds to be capitalized prior to and during the estimated construction period at an assumed annual interest rate of six per centum (6%) are estimated to be as follows:

1. Shreveport-Alexandria Project $136,245,000
2. Alexandria-Northeast Louisiana
 Project (Northern terminus
 7 miles west of Monroe) $126,696,000
3. Alexandria-Opelousas Project $ 81,059,000
 ____________
 Total for Expressway System $344,000,000

which Project costs are not in excess of the authorized amounts set forth in Section 3 of the 1970 Act, as such authorized amounts may be increased, in the sound discretion of the Authority, in each case by an amount not to exceed ten per centum (10%) of such authorized amount.
"Section 10. That it is hereby found and determined that the cost of construction of each of the Expressway Projects authorized by the 1970 Act will be in excess of the authorized amounts set forth in Section 3 thereof and, by virtue of the authority conferred on it by said Section 3, the Authority hereby increases the maximum amount that may be expended for each such Expressway Project to the respective amount set forth for that Project in Section 9 of this Resolution."
Plaintiffs contend the only reasonable interpretation of Section 3 of the Act is that the finding of financial feasibility must be restricted to a maximum expenditure of $331,000,000; that the 10% increase is not applicable to the time of the financial feasibility determination; and that if "at the time the expressway project is to be constructed" the L.E.A. finds its initial estimate of cost was too low, then and only then can it implement the 10% increase. In this regard plaintiffs further contend the phrase "the time the expressway project is to be constructed" means the time when the L.E.A. has received bids and is prepared to let construction contracts on the entire project, since this is *724 the only time there can be reasonable certainty the project can be completed within the statutory maximum expenditure.
In argument before this court plaintiffs express their fear that construction of the project, found to be feasible on the basis of preliminary (although very detailed) studies, will be commenced in segments or stages, and that after expenditure of the maximum amount the project will only be partially completed. At this point, plaintiffs argue, either the State will have wasted over $300,000,000 on an unusable highway or the Legislature will be required to approve funds for completion.
In essence plaintiffs are arguing that it would be a wiser procedure to receive bids on the entire project before issuing bonds and beginning construction. However, this argument ignores the wording of the Act, which directs the L.E.A. to request issuance of bonds and to construct the project as soon as practical and prudent after its feasibility finding is concurred in by the Governor.[2]
It is a basic concept of the doctrine of separation of governmental powers that the judicial branch cannot question the wisdom of a decision of a Legislature made in the proper performance of its law making function. Const. Art. 2. In considering the proposed project, Legislative committees presumably heard arguments as to the wisdom of the project and as to methods of assuring that the project would be completed within a stipulated maximum expenditure. The Legislature thereafter decided that "construction of the expressway system is necessary and desirable to facilitate vehicular traffic, to diminish the present handicaps and hazards and promote safety on the congested highways in the state of Louisiana, and to promote the safety, welfare and economic prosperity of the people of the state of Louisiana; * * *" The Legislature further decided to authorize and direct construction of the project, conditioned only upon a finding of financial feasibility as defined in the Act.
If the Legislature had decided that the project should be constructed and bonds issued only after bids on the entire project were found to be within the maximum expenditure provision, then the authorization of the construction conditioned only upon the feasibility determination would be meaningless and the determination itself would serve no useful purpose.
We conclude that the Legislature intended to, and in clear language did, authorize and direct issuance of bonds and construction of the project as soon as practicable and prudent after the L.E.A.'s resolution finding the project to be financially feasible was concurred in by the Governor. Whether the Legislature was wise and prudent in not placing additional safeguards in the statute to assure that the project would be completed within the stipulated maximum expenditure is not a proper issue for review by the judicial branch of the government.
As to plaintiffs' related argument that the 10% increase in the maximum expenditure cannot be implemented at the time of the financial feasibility determination, resolution of that issue depends on the interpretation *725 of the phrase "at the time the expressway project is to be constructed."
When the Legislature enacted Act No. 246, it had no way of knowing what delays would be incurred between the time the Act was passed and the time the L.E.A. adopted the resolution finding the project financially feasible and began construction. To avert the necessity of the L.E.A. having to seek additional funds to cover an interim increase in construction costs, the Legislature provided for a discretionary 10% increase in the authorized maximum expenditure.
We construe the phrase "the time the expressway project is to be constructed" to mean the time when the L.E.A. adopts the resolution to construct the project. This is the first procedural step in the construction process and is the first definite point in time when the "project is to be constructed."
Furthermore, all of the studies upon which the L.E.A. based its financial feasibility determination were projected to an anticipated date of beginning of physical construction, and costs developed in the studies were projected through the period during which the L.E.A. anticipated receiving all construction bids.
We therefore conclude that the time the L.E.A. adopted the resolution finding the project financially feasible was "the time the expressway project is to be constructed," and at that time the L.E.A. in its discretion could properly implement the 10% increase.

FINDING OF FINANCIAL FEASIBILITY
The vast majority of the voluminous evidence was offered in connection with plaintiffs' attack on the basis of the L.E. A.'s finding that the project was financially feasible. Section 5 of the Act provided a period within which:
"* * * any person or persons in interest shall have the right to contest the legality of the proceedings taken by the Authority in adopting the resolution making such finding and determination and contesting whether or not such finding and determination was arbitrary, capricious or without foundation in fact after which time no one shall have any cause or right of action to contest the legality of such proceedings or such finding and determination for any cause whatsoever. * * *"
Plaintiffs contend in this court that they proved the determination was without foundation in fact and assert several arguments in this regard, which we will review individually but not necessarily in the order presented.
I. The Authority was not in a position to make a determination of financial feasibility on July 23, 1971.[3]
Plaintiffs' argument on this point is two-fold. First, the L.E.A. did not obtain the approval of the Department of the Interior for Construction of 27 miles of the project through the Kisatchie National Forest. In this respect plaintiffs argue that no rational determination of cost can be made until the alignment of the route is certain.
The Staff Forester testified that the U. S. Forest Service had dealt routinely with the Louisiana Department of Highways and several parish police juries on granting rights of way. He had met preliminarily with L.E.A. representatives, but no formal application had been made. He testified that upon application his office prepared an environmental statement for review by the Council on Environmental Quality and that a final decision normally required about six months.
*726 The testimony related only to the procedure for obtaining approval and the time therein involved. While perhaps an application and approval would have provided more assurance of the correctness of the feasibility finding, we find no indication in the record that the L.E.A. was unreasonable in believing that the final decision will be favorable. Furthermore, any effect on the feasibility of the project incident to obtaining approval is merely a suggestion of counsel without evidentiary basis.
Second, Act No. 232 of 1954 granted the L.E.A. authority to determine the location of the project subject to the approval of the Governor and the Department of Highways. Plaintiffs concede the Governor approved the route when he concurred in the L.E.A. resolution, but that no approval had been obtained from the Department.
During the planning stages L.E.A. consultants were in frequent contact with Department officials. The Department assigned a Traffic and Planning Engineer as liason man on the project, and he and the Director of Highways (an ex-officio member of the L.E.A.) attended numerous L. E.A. meetings. When the resolution determining feasibility was adopted, the Director voted in favor of the resolution. Furthermore, on the same day he wrote a letter to the Chairman of the L.E.A. fully discussing the route, a sketch of which was attached.
Under these circumstances we decline to find that the L.E.A. was not in a position to make the determination because the Department had not yet approved the route.
II. The cost of construction of the Louisiana Expressway System substantially exceeds the maximums provided in Act 246 of 1970.
We first distinguish between the cost of the physical construction of the highway and the total cost of the entire project. The statutory maximum expenditure applies to the total cost of the entire project, which includes numerous other costs in addition to the cost of physical construction.[4]
Here, plaintiffs attack the determination of the cost of physical construction, estimated to be $228,326,000.
To estimate the cost of physical construction, the consulting engineers established profiles for the roadway and by computer determined quantities of earthwork, pavement, shoulder pavement, guard rail and other roadway and embankment items. They established unit prices by studying bid prices for similar work in this state over a five year period and by accepting, rejecting or adjusting these average prices based on considerations of the particular work for which each bid was submitted and on technical experience and judgment. They further projected the unit *727 prices to provide for cost increases anticipated up to the time when construction bids were to be taken. The consultants then multiplied the established quantities by the projected unit prices and added the cost for toll collection facilities, maintenance and administration buildings and communication systems. They thus estimated the cost of physical construction at $228,000,000.
For purposes of evaluating and attacking this estimate, plaintiffs accepted the consultants' estimate of quantities and of time necessary for completion of the project. However, they disputed the unit prices used and the method of applying anticipated cost increases.
Evidence as to unit prices was presented for the L.E.A. by the project engineer of the consulting firm and for plaintiffs by a former chief engineer for the Louisiana Department of Highways. Both used a publication known as the Weighted Average Unit Prices, which is a quarterly compilation of unit prices listed by successful bidders for highway construction in Louisiana.
However, these experts used different approaches in the application of the compiled unit prices. Plaintiffs' expert observed an averaged price for each item for 1970 and 1971 and took the latest price. He thus arrived at an absolute unit price averaged from all successful highway bids in 1971. Multiplying each unit price by the quantity required, he arrived at the sum of $231,000,000 for the cost of construction at the end of 1971. He then multiplied this figure by 5% (which he estimated to be the annual increase in costs over the period of construction) and added the 5% to the previous total. He then repeated this procedure three times in order to obtain the inflated cost over the 3½ years of construction. He then reduced the added cost attributable to inflation by one-half in order to allow for the fact that inflation for the entire period would not be applicable to the portions let to contract early in the construction. His final estimate of the cost of construction alone was $259,000,000.
On the other hand, defendants' expert studied the average unit cost for each item for each quarter of the past five years. By studying each bid as to the amount, type, location and other particulars of the work involved, and by drawing on his own knowledge, experience and judgment, he arrived at a projected unit price for each item, estimated as of the time contract bids were expected to be received. (Bidding was expected to be carried on throughout 1972, with actual construction to start July 1, 1972.) His estimated cost of construction was $228,000,000.
Using the statutory review standard of whether the factual finding was without foundation in fact, we find the latter approach reasonable.
The discrepancies are caused by two factors, the difference in approach in determining unit prices and the difference in determining an amount attributable to inflation.
As to inflation, the L.E.A., with funding assured through the issuance of authorized bonds, anticipated receiving bids and letting contracts for the various segments of the project as soon as each segment was finally designed, servitudes acquired and utility adjustments arranged. Experts with vast experience in toll road construction with similar fund availability testified that the estimated completion time of 3½ years was reasonable if that plan was followed. It was therefore reasonable for the L.E.A. to expect to begin bond sales in November, 1971, to receive construction bids throughout 1972 and to begin actual construction on July 1, 1972. Of course, since bid prices determined the cost, there was no need to project the inflation factor beyond the time bids were expected.
This progress schedule was in contrast to the normal construction time for Louisiana highways, where the availability of *728 funds and the delays inherent in working with Federal agencies are ever-present problems. Here, funds were available and no Federal agencies were involved. Thus we find reasonable the projection of costs to the point where the L.E.A. expected to receive bids rather than to later points in the construction schedule.
We also consider reasonable the application of judgment and experience to the evaluation of the listed unit prices.[5] Those figures were subject to many variables and by no means accurate and mathematically absolute in themselves. They simply constituted a basis for prediction, the reliability of which was necessarily based also on educated judgment. Furthermore, predictability can more accurately be based on a five year history rather than a two year history.
When we closely examine the estimates of the two experts, we find that plaintiffs' expert estimated a cost of $231,000,000 (if bids were received at the end of 1971) and defendants' expert estimated a cost of $228,000,000 (if bids were received throughout 1972). This difference is slightly more than 1%. As stated above, the wide variance in the final estimated construction costs was due to the flat percentage inflation rate applied by plaintiffs' expert. This variance would be negated if the expedited bidding had proceeded as anticipated.
However, plaintiffs point out two contracts recently let for construction of small segments of Interstate-20 in a comparable area to the northern portion of the project. The prices in these contracts averaged about $1,250,000 per mile, as compared with $824,000 per mile for the estimated cost of the entire L.E.A. project, including interchanges and the Red River Bridge.
The project engineer explained that no existing highway in the state can be used as a basis for cost comparison with this project, which contemplates building 277 miles of interstate highway within a short period of time. The existing 400 miles were built over a 15 year period. He again pointed out the absence of problems with availability of funds and delays involving Federal agencies.
While the per mile costs vary widely, we again refer to the relative consistency between the detailed estimates by the experts, absent the time-inflation factor. We deem it important that plaintiffs could not significantly attack the project engineer's detailed estimate of construction costs on any point other than those related to time factors.
Furthermore, we were impressed with the testimony of the project engineer and the soundness of his reasoning. He testified that his firm's studies were widely accepted by bond firms bidding on revenue bonds for toll road construction. Its reputation in this regard depends on the propriety and accuracy of its engineering reports, and as pointed out by the project engineer, the firm was paid a substantial fee for performing the highly detailed study rather than guessing at a figure based on per mile cost of other interstate construction.
We conclude that neither the estimated cost of construction contained in the engineering study nor that part of the determination of feasibility based thereon were without foundation in fact.
*729 III. The uncontested testimony of defendants' experts establishes that the cost of the Alexandria-Northeast Louisiana project exceeds the maximum sum stipulated in the Act plus ten percent, preventing construction of any portion of the Expressway System.
This argument relates primarily to the capitalized interest during the construction period estimated at $34,200,000. (See footnote 4).
The consulting engineers arrived at a total project cost of $309,800,000, before addition of capitalized interest. They then provided the financial consultants with a table showing their annual money needs for purposes of construction as follows:

 Year I $ 30,100,000
 Year II 130,100,000
 Year III 120,200,000
 Year IV 29,400,000
 ____________
 Total $309,800,000

The financial consultants then applied an assumed interest rate on bonds of 6% and projected the amount of interest which would be payable from the time the bonds were issued until the time the project was completed and put into service.
Plaintiffs contend that the project engineer stated in his testimony that the amounts for the yearly construction requirements would be required on or before the beginning of each year and that the financial consultants' report contemplated the sale of bonds at various times during each year. On this basis they argue that funds needed at the start of each year could not be furnished by the sale of bonds at various times during that year, and that the sale of bonds on or before the beginning of each year would necessarily entail the incurring of substantially more interest than contemplated by the financial consultants.
The fallacy in this argument is that the project engineer did not testify that the listed amounts would be required at the beginning of each year. A reasonable interpretation of his testimony is that the listed amount would be required between the beginning of one year and the end of that year. In other words, he anticipated that the listed amount would be expended throughout the course of the entire period. This is illustrated by his reference to the "sale by quarter or whatever", which indicates to us that he considered it his function to estimate the amount required for construction during the course of each year, and he considered it the function of the financial consultants to devise the most economical method of obtaining these funds through the sale of bonds.
It is apparent that construction funds for an entire year are not needed in their entirety on or before the beginning of that year. One of the financial consultants explained that bonds were often sold at the beginning of a year and the proceeds deposited at interest until needed, which produced an offset of interest earned against interest payable. However, because recent legislation placed any such invested funds beyond the reach of the agency, the financial consultants planned several bond issues in smaller amounts over the course of each year rather than one bond issue in the total amount at the beginning of that year. As a practical matter, this accomplishes a similar saving of interest.
IV. The Expressway Authority failed to provide feeder roads not in excess of one and one-half miles in length connecting into MacArthur Drive as ordered by Section 2, Act 246 of 1970.
Section 1(5) of the Act requires that the Alexandria-Northeast Project provide convenient access to the City of Alexandria as follows:
"* * * provided that the toll road shall provide convenient access to MacArthur Drive by feeder roads not in excess of one and one half miles in length connecting directly into MacArthur Drive or come through the city of Alexandria. * * *"
*730 "Feeder road" is defined in Act No. 232 of 1954 as "any road which in the opinion of the Authority is necessary to create or facilitate access to a project."
The evidence established that the route did not pass through the boundaries of the City and that the Alexandria-Northeast Project intersected U. S. Highway No. 165 at a point slightly more than 1½ miles from MacArthur Drive.
An engineer testified that he measured a distance of 1.52 miles on U. S. Highway No. 165 from the point where a northbound motorist would exit from the expressway onto that highway and the center line of MacArthur Drive at its intersection with that highway.
There is a traffic circle at the intersection of MacArthur Drive and U. S. Highway No. 165. The distance from the point of exit from the Expressway onto U. S. Highway No. 165 and the beginning point of access to the traffic circle is less than 1½ miles.
The statute is not explicit as to the beginning and ending points for measuring the maximum distance of the feeder road. Plaintiffs would interpret that portion of the statute to require measurement from the center line of the Expressway to the center line of MacArthur Drive, while the L.E.A. would interpret the critical points to be the point of exit from the Expressway and the point of entrance into the MacArthur Drive traffic circle. In determining whether or not the L.E.A. has complied with the requirement, we believe that the purpose of the statute is to provide convenient access to MacArthur Drive by feeder roads of maximum length. We further believe that the alignment of the road established by the L.E.A. substantially fills this requirement.
However, plaintiffs argue that "feeder roads" mean more than one road. Again the statute is not explicit in that it does not require a certain minimum number of feeder roads but simply make the general provision "by feeder roads". And again looking to the purpose of the statute, we conclude that the purpose of providing access from the Alexandria-Northeast Project to MacArthur Drive by feeder roads is fulfilled by the alignment of the route as it is presently proposed to intersect with U. S. Highway No. 165.
V. The proposed Toll Road fails to meet the design criteria in Acts 246 and 247 of 1970.
Section 2 of the Act requires that the toll road "shall be constructed in conformity with design and other standards at least comparable to those of existing interstate routes currently in use in the state of Louisiana."
Plaintiffs contend that the project fails to meet these standards in the following particulars:
1. The median, or depressed grass area dividing the two roadways, is only 36 feet wide in the rural areas designed for 70 MPH speed limits, whereas the median width of all interstate highways ever constructed in Louisiana in these areas is 64 feet.
2. The width of long bridges, or bridges over 250 feet in length, is only 34 feet, whereas standards for interstate highways since 1968 has been 40 feet, which provides full shoulder widths.
3. The width of bridges on intersecting crossroads overpassing the system is 28 feet, whereas standards for interstate highways since 1969 has been 32 feet.
4. The standard for road embankment width slopes is a 4 to 1 slope, or a drop of no more than one foot to every four feet of slope, whereas the standard for interstate highways since 1968 has been a 6 to 1 slope.
We immediately discount the last three alleged criteria failures, inasmuch as *731 the Interstate Engineer for the Department of Highways testified that in July, 1971, there were no interstate highways in use which met the additional standards adopted in 1968. There was no contradictory testimony.
As to the median width, the Interstate Engineer testified that a 36 foot median complies with national interstate highway standards, but that Louisiana at the beginning of its interstate program in 1956 adopted a median width of 64 feet in rural areas designed for 70 MPH speed limit. Every mile of interstate highway in rural areas of Louisiana has been built with this median width. In his opinion a highway with a 36 foot median in a 70 mile per hour zone is "not as safe as we want to build them today" and is substandard as compared to the best design for controlled access to highways.
The Traffic and Planning Engineer for the Department of Highways testified that 80% of automobiles leaving the traveled portion of a highway hit an obstruction within 30 feet and that any median which is wider than 30 feet does not require a barrier down the middle to be considered safe. He further stated that one of the considerations in adopting the median width of 64 feet was to permit the construction of two additional lanes on the inside, if it became necessary in the future, while retaining a 40 foot median width. We believe the statute requires a median width of 64 feet and accordingly order a revision in the design to accomplish compliance with this statute.
In order to change the design to a 64 foot median width, the Interstate Engineer stated that it would be necessary to make all overpasses 28 feet longer, as well as to extend the cross drains or box culverts under the roadway. He estimated that extension of the 115 overpasses would cost approximately $300.00 per foot. This represents a total cost of $966,000, plus the cost of the cross drains, which he stated did not involve a substantial cost.
The estimated additional cost of construction is still within the statutory limit as interpreted in this decision. Furthermore, there is no evidence that any additional right of way in excess of the 300 feet presently contemplated would be required for increasing the width of the median.
Plaintiffs additionally contend that Act No. 247 of 1970 must be read in pari materia with Act No. 246. Act No. 247 requires that any petition filed for the purpose of expropriating property must contain a resolution by the L.E.A. declaring that "the location and design of the proposed highway improvement are in accordance with the best modern practices adopted in the interest of safety and convenience of the traveling public." Plaintiffs therefore argue that the two acts read together clearly require that the project be designed to the latest Louisiana interstate standards, even if those standards had not been incorporated into the highways existing when the statute and the resolution were adopted.
We do not agree. The statute specifically adopted standards comparable to those of existing interstate routes currently in use. The Legislature certainly did not intend to require one standard for construction of a highway project and a different standard for expropriation of property necessary for that construction. We believe that the language of Act No. 247 contemplates the same design standards as specifically stated in Act No. 246, and simply requires an affidavit that the highway has been designed in accordance with those standards.
Furthermore, all experts agreed that the median width deficiency was the most important from the standpoint of safety and that the other alleged deficiencies were adopted simply to comply with the national interstate standards.
*732 VI. The revenue projection by Wilbur Smith and Associates grossly overestimate the revenues to be generated by the Toll Road.
For the project to be financially feasible as defined in Act No. 246, average gross revenues must equal 66 2/3% of the average annual debt service requirement. The L. E.A. based traffic and revenue estimates on a report entitled "Traffic, Revenue and Economic Impact Study" by the largest transportation consultants in the world.
The consultants performed 72,123 roadside interviews in 1970, in addition to more than 40,000 performed in two previous studies. They contacted Chambers of Commerce, planning agencies, large manufacturers, large farming interests and other civic, professional and industrial groups. They obtained population projections from the Federal and State governments, as well as business and economic data and projections. More than 15,000 man hours went into preparation and production of the report. Similar reports by these consultants have been used and relied upon by investment banking interests in evaluating revenue bonds for toll road projects throughout the world.
An executive of the consulting firm admitted that this type of study involves a considerable amount of judgment. However, since investment bankers rely on the accuracy of these studies in evaluating revenue bond offerings, the future of the firm depends on its reputation as to accuracy. He then listed a large number of toll road projects in which his firm had furnished studies which proved to be accurate upon completion of the project or which were used in rejecting the feasibility of a proposed project.
On behalf of plaintiffs an expert in economics and statistics attacked the report in various particulars. In one attack he asserted there is no mathematical justification for establishing $0.022 per mile as the optimum toll rate. Although a graph contained in the study is misleading in this regard, testimony and the text of the study explain that the toll rate was established by reference to rates on similar toll roads in other states. The graph in question actually indicates an optimum toll rate at a higher price, and the consultants recommended the lower rate to achieve a desired balance between the amount of revenue produced and the amount of traffic service provided.
Next contending the report exaggerates the economic impact of the road, he testified that the report did not statistically substantiate any material impact on economic growth in the parishes where interstate highways were opened between 1960 and 1970. He also furnished data on changes in personal income and manufacturing employment to illustrate that there was no substantial effect.
Personal income, capital investment in manufacturing plants, and other barometers of economic growth respond to many factors. It is difficult to statistically demonstrate the influence of any one factor. In essence the expert did not himself rely on statistics alone in forming his opinion that the project will not have a significant impact on economic growth, but rather relied on his judgment and his knowledge of the nature of the area.
As an appellate court, we do not serve our function in reviewing administrative factual findings by selecting the better of two expert opinions based primarily on judgment. We simply use the opinion of the attacking expert to assist us in our determination of whether the administrative finding was without foundation in fact. Using this standard, we find that plaintiffs have failed to successfully attack the study's conclusions as to the impact of the system on economic growth.
Plaintiffs' expert further contends that the time-distance relationships in the study are computed on an unreasonable assumption of 70 miles per hour average travel speed. The consultants explained that data obtained from monitoring other highways *733 indicated an average speed slightly in excess of 70 for low volume highways. Furthermore, they envisioned a future upward adjustment of the speed limit. We believe that it was reasonable for the consultants to use this average travel speed developed through their investigation of similar highways.
Neither do we consider it inconsistent that the consultants used concession sales in projecting revenues but neglected to consider stopping time at concession stands in determining time-distance relationships. The value of this determination is to compare trip times on the Expressway with those on existing highways in order to project the number of motorists who will utilize the system. Voluntary stops for refreshments and other needs should not be considered in assigning average driving times on either alternative.
In addition to time savings, population was the other variable used by the consultants in calculating an accessibility index. This index described the potential interaction between growth centers within the travel corridor and metropolitan regional markets within 200 miles of the corridor. Plaintiffs strongly attack the accuracy of the consultant's population projections. Using extensive data from 1940, 1950, 1960 and 1970 census reports to illustrate that parishes within the corridor have been areas of comparatively slow population growth, their expert stated his belief that the consultants overprojected population growth between 1970 and 1990.
The consultants also used the census data, but supplemented this with interviews with Chamber of Commerce people, state, parish and municipal planning agencies, large industrial, commercial and agricultural interests, and other professional and governmental agencies in tune with population and economic activity information. One source of information, a publication of the Louisiana Department of Employment Security, projected state population in 1985 at a figure considerably in excess of that projected by the consultants for 1990.
We have closely examined the statistics in the record and note that the percentage change in population between 1960 and 1970 in the 13 corridor parishes (particularly the eight smaller ones) was substantially less than the state and national average. In the two previous decades the percentage change was more in line with (and that of four of the five largest parishes exceeded) the state and national averages. Essentially, the variance between the experts arose because of different approaches. Plaintiffs' expert took into account birth rates, death rates and migration rates from the recent past for detailed age, race and sex groups and projected these into the future based on certain assumptions about the continuation of the rates. Defendants' expert used much the same statistics, but projected them on the basis of information gathered from various sources with adjustments based on judgment and on anticipated short and long range impact of the expressway project. Again, we decline to select the better approach, but we conclude that plaintiffs have failed to prove that the approach used by the consultants or the conclusions based thereon were without foundation in fact.

DECREE
The judgment of the district court is amended to prohibit defendants from constructing the expressway system with a median width of less than 64 feet. As amended, the judgment is affirmed.
Amended and affirmed.
NOTES
[1] Section 16 provides in pertinent part: "Every statute enacted by the Legislature shall embrace but one object, and shall have a title indicative of its object."
[2] The pertinent wording of Section 2 of the Act is:

"... accordingly, the Authority is hereby authorized and directed to proceed forthwith with such further definitive studies and investigations as are necessary and proper to enable it to plan and construct the expressway system; and the Authority, subject to the condition of a finding and determination by it that the expressway system is financially feasible, such finding and determination to be concurred in by the governor, as hereinafter in this Act prescribed, is further authorized and directed to proceed as soon as it deems practicable and prudent to request the state bond commission to finance the costs of the construction thereof as the term `costs' is defined in the Louisiana Expressway Act, by the issuance of bonds and thereafter the Authority is authorized and directed to construct the expressway system and place the same in use."
[3] The title of each argument is quoted exactly from plaintiffs' brief in these subheadings.
[4] In estimating the total cost of the entire project, the consulting engineers listed the various items of cost as follows:

 Total System
 Preliminary Expenses $ 1,000,000
 Rights-of-Way 17,262,000
 Utility Adjustments 5,320,000
 Construction 228,326,000
 Engineering 25,116,000
 Administrative & Legal Expenses 2,300,000
 Initial Operating & Maintenance
 Equipment and Supplies 2,100,000
 _____________
 Sub-total $281,524,000
 Contingencies 28,152,000
 _____________
 Sub-total $309,800,000 (rounded)
 Capitalized Bond Interest during
 construction period 34,200,000
 _____________
 Total $344,000,000

[5] The value of applying judgment and experience was illustrated by an error pointed out by plaintiffs themselves. Plaintiffs complained in briefs that the project engineer mistakenly used the weighted average unit price of galvanized culvert pipe rather than the more expensive reinforced concrete pipe required to meet design criteria. But a close examination of the computations by the project engineer reveals that he copied the erroneous lower figures in the five year study, but in arriving at the unit price used in the estimate, he considerably upgraded the low figure and arrived at a unit price very consistent with that of the more expensive material.